The STATE of Ohio, Appellee,

v.

SUTTON, Appellant.

[Cite as *State v. Sutton* (2001), 145 Ohio App.3d 408.]

Court of Appeals of Ohio,
Twelfth District, Butler County.

No. CA2000–04–061.

Decided Aug. 20, 2001.

*Robin N. Piper*, Butler County Prosecuting Attorney, and *Daniel G. Eichel*, Assistant Prosecuting Attorney, for appellee.

*Fred Miller,* for appellant.

POWELL, Judge.

Defendant-appellant, Andrew Sutton, appeals his conviction in the Butler County Court of Common Pleas for murder.

Appellant was indicted in June 1999 on one count of murder in violation of R.C. 2903.02(B) and one count of felonious assault in violation of R.C. 2903.11(A)(1). The charges stemmed from an incident that occurred in the early morning hours of May 15, 1999, wherein appellant and his friend, James McIntosh ("McIntosh"), allegedly assaulted Ernest Gross ("Gross") and his friend, Darrell Robbins ("Robbins"), outside Barney's Bar in Hamilton, Ohio. Gross was pronounced dead at 1:45 a.m. that morning in the emergency room of a local hospital. Appellant pled not guilty to the charges. A jury trial held on January 4–7, 2000, revealed the following facts:

On the evening of May 14, 1999, Cynthia and Patrick Brennan went to Barney's to shoot pool. In the bar, Cynthia talked a little bit with Gross, an acquaintance of hers. Also in the bar were appellant, McIntosh, Robbins, and Robbins's girlfriend, Misty McIntosh ("Misty"), who is also James McIntosh's cousin. There were no arguments, altercations, or fights in the bar. Shortly before the bar's 1:00 a.m. closing time, Gross came to Cynthia to say goodbye. Cynthia testified that Gross's speech was fine and that he did not appear to be stumbling or unsteady on his feet. By contrast, Robbins was stumbling a bit and appeared to have had "a few too many." Gross and Robbins left the bar together. Five minutes later, Cynthia and her husband left the bar and discovered both Gross and Robbins lying in the street unconscious. Gross's face was so bloody that Cynthia did not recognize him at first. Frothy blood was coming out of Gross's mouth; Gross appeared to be gasping for air.

John Gregory ("John"), a fourteen-year-old who was spending the night at his former stepfather's house located across the street from the bar, testified as to what happened outside the bar. John was watching television with his stepfather, John Henry Marcum ("Marcum"), when he heard yelling. Looking out the window, John observed "two older guys, two younger guys and a girl," later identified as Gross, Robbins, appellant, McIntosh, and Misty, respectively. John testified that Robbins and McIntosh were yelling and arguing when McIntosh hit Robbins. After Robbins hit back, McIntosh kept hitting Robbins, knocked him down to the ground, and kicked him in the shoulder. Appellant and Gross stood during the altercation between McIntosh and Robbins, doing nothing. However, once Robbins was on the ground, Gross started walking towards Robbins and

McIntosh. Gross never made it; appellant hit him in the head with his fist four times, knocking him to the ground.

Gross fell straight to the ground without breaking his fall, and struck his head on the pavement. Thereafter, while Gross was motionless on the ground, appellant stomped his head "real hard" two or three times. Appellant yelled at Gross, "pointing in his face." Appellant then went to Robbins, rolled him over, kicked him, and slammed his head on the ground. John testified that Gross never hit anybody and did not try to hit appellant back. John testified that after appellant left the scene, McIntosh pulled Gross to the side of the street.

During the altercation between McIntosh and Robbins, but before appellant hit Gross, John called out his stepfather, Marcum. Looking out the window, Marcum observed both Gross and Robbins lying in the street, with McIntosh standing by Gross in the street, and appellant and Misty standing over by the curb. As Robbins was trying to get up, both appellant and McIntosh kicked him. Appellant also stomped on Robbins's face and slammed his head to the ground before leaving the scene. Marcum testified that during all that time, Gross never moved. Marcum testified that he never saw appellant kick Gross, yell at him, or stand over him, or Gross being dragged out of the street. Marcum also testified that he left the window twice, once to get the phone, and once to hang it up.

Donna Hacker ("Hacker") lives in a house that is catercorner to the bar. Hacker testified that when she first heard "some screaming and hollering," she did not look out right away. When she finally looked out, she observed Gross and Robbins lying in the street. McIntosh was standing with Misty over Robbins. Appellant was loudly smacking Gross, telling him, "Get up mother fucker." Hacker testified that the smacks were not aggressive. Hacker did not see appellant stomp on Gross's face, kick Robbins, or slam Robbins's head to the ground.

After leaving the scene, appellant went to Joshua Childers's house ("Childers"), two blocks away from the bar. Childers, a friend of appellant and McIntosh, testified that appellant's right hand was shaking and had blood on it, and that appellant's shoes had blood on them. When the police picked up appellant later that morning, appellant had a different pair of shoes given to him by Childers.

Adrian Jackson, a police officer from the Hamilton Police Department, was dispatched to the scene. As he was approaching the bar, he observed McIntosh dragging Gross to a curb. Both Gross and Robbins had visible facial injuries. Gross was coughing up blood and gasping for air. Lieutenant Ralph Bucheit from the Hamilton Fire Department was also dispatched to the scene. He testified that Gross had blood in his mouth, a swollen face, and multiple trauma to his head and face. A forensic scientist from the Ohio Bureau of Criminal Identification testified that while appellant, McIntosh, and Robbins could be

excluded as the source of the blood found on appellant's pants, Gross could not be so excluded.

Charles N. Hurwitz, M.D. ("Dr.Hurwitz") performed an autopsy and testified that the cause of Gross's death was blunt trauma to his head. Dr. Hurwitz testified that all of the hemorrhages found under Gross's scalp and skull amounted to an intracranial trauma, which people usually do not survive. Dr. Hurwitz testified that Gross's head injuries were consistent with someone being hit, knocked out, and falling backwards without breaking his fall. Dr. Hurwitz also testified that a laceration on Gross's neck could have been caused by a shoe.

On cross-examination, Dr. Hurwitz testified that Gross's facial injuries (contusions and abrasions) were minor and that they did not contribute to his death. Dr. Hurwitz noted that Gross suffered no facial fractures and that he was not stomped to death. Dr. Hurwitz also stated that Gross had a blood-alcohol content of .171 grams per deciliter. On redirect examination, Dr. Hurwitz testified that "[i]n my opinion, if someone is hit with a fist hard enough to knock him out to the point where he would fall backwards and hit his skull on the concrete that would've contributed to the cause of death that the actual blow to the face would have."

On January 7, 2000, a jury acquitted appellant of felonious assault but found him guilty of murder as charged and guilty of attempted felonious assault. Appellant was subsequently sentenced accordingly. This appeal follows in which appellant raises two assignments of error.

"Assignment of Error No. 1:

"The trial court erred to the prejudice of defendant–appellant when it refused to permit appellant to introduce evidence regarding the victim's use of cocaine."

■ In this assignment of error, appellant argues that the trial court was erroneous and inconsistent when it allowed "evidence of only the alcohol but not of the cocaine to be heard by the jury." Appellant contends that since Gross's cause of death was striking his head on the pavement when he fell, "[i]f indeed Gross had contributed to his own fall by mixing alcohol and cocaine, causing him to be unsteady on his feet, then it would have been less likely that the jury would have convicted [appellant] of causing Gross's death by knocking him down." The state responds that evidence of cocaine in Gross's system was either irrelevant or prejudicial, and therefore inadmissible under Evid.R. 402 or 403(A).

Gross's autopsy revealed that Gross not only had a blood-alcohol content of .171 but that he also had cocaine in his system when he died. Before trial, the state filed a motion *in limine* to exclude evidence of alcohol and cocaine in Gross's system. During trial, defense counsel conducted a voir dire of Dr. Hurwitz to demonstrate what his testimony would be regarding the synergistic effect of

cocaine on alcohol, and the effect cocaine combined with alcohol would have on Gross's balance. The trial court denied the state's motion *in limine* regarding Gross's blood-alcohol content but granted it with regard to the presence of cocaine in Gross's system.

The admission or exclusion of evidence is generally left to the discretion of the trial court. *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 400–401, 473 N.E.2d 768, 791. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 172–173, 404 N.E.2d 144, 148–149. Evid.R. 403(A) provides: "Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

On voir dire, Dr. Hurwitz testified that Gross's cocaine ingestion was within the last few hours of his life. Dr. Hurwitz testified that cocaine can have a synergistic effect in that it can heighten the effects of alcohol on an individual, and that a combination of cocaine and alcohol "would not be a good thing to have on board." However, Dr. Hurwitz could not say that the presence of cocaine in Gross's system "would have made [Gross] any more unsteady on his feet than he would have been[.]" Nor could Dr. Hurwitz testify that "there's a synergistic [e]ffect between the cocaine that affects the balance."

In ruling on the state's motion *in limine,* the trial court found:

"The Court having heard all the evidence for purposes of this * * * hearing, will rule that the defense can explore the alcohol level of Mr. Gross at the time of the alleged incident and will deny the motion in regard to the alcohol. With regards to any drugs including cocaine, it's not been shown to the satisfaction of this Court that it's relevant that cocaine in fact had or does what or with Mr. Gross, or with anyone, necessarily affected his balance and therefore it's irrelevant and therefore will grant the motion with respect to cocaine * * *.

"* * *

"I made that ruling a few moments ago on the motion *in limine,* I would like to add to the ruling that to the extent that there is limited evidence which may be speculative as to whether or not * * * with respect to Mr. Gross' case that the ingestion of cocaine had a synergistic [e]ffect with the alcohol that it's speculative and of very limited relevance and that the prejudicial * * * [e]ffect of that it could very well be misleading."

Upon thoroughly reviewing the record, we find that the trial court did not abuse its discretion by refusing to admit evidence of cocaine in Gross's system before he died. Assuming, *arguendo,* that such evidence was remotely relevant, we find that any probative value was substantially outweighed by the dangers listed in Evid.R. 403(A), and the evidence was therefore inadmissible. There was no evidence that Gross was acting as if he was under the influence of cocaine, that he had ingested cocaine while in the bar or before appellant assaulted him, or that cocaine was related to appellant's assault of Gross. Nor was there any evidence that the cocaine affected Gross's balance in any way or made him unsteady. Cynthia Brennan testified that unlike Robbins, Gross did not appear to be stumbling or unsteady on his feet. On voir dire, Dr. Hurwitz could not state that the presence of cocaine in Gross's system "would have made [Gross] any more unsteady on his feet than he would have been[.]" Nor could Dr. Hurwitz testify that there is "a synergistic [e]ffect between the cocaine that affects the balance."

The considerations that appellant would argue to the jury are illustrative of the very reasons why Evid.R. 403(A) was enacted. To allow evidence that Gross had cocaine in his system before his death could lead jurors who disapproved of drug use "to devalue the decedent's murder and excuse the perpetrator * * * from criminal liability." *State v. Frost* (Nov. 13, 1998), Montgomery App. No. 16564, unreported, 1998 WL 864907, at * 2. We therefore uphold the trial court's refusal to admit evidence of cocaine in Gross's system. Appellant's first assignment of error is overruled.

"Assignment of error No. 2:

"The evidence was insufficient to justify a conviction of appellant."

In this assignment of error, appellant argues that the trial court erred by denying his Crim.R. 29(A) motion. Appellant contends that the evidence introduced at trial was insufficient to prove that appellant (1) knowingly caused serious physical harm to Gross and (2) "intended for his striking of Gross to actually kill [Gross]." [1]

Under Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has. been proved beyond a reasonable doubt. *State v. Bridgeman* (1978), 55 Ohio St.2d 261, 9

---

1. Curiously, appellant also contends that "[t]he state attempted to portray Gross as an innocent victim, but given the alcohol and recent cocaine in his system (assuming that the cocaine evidence was admissible) and given that Gross and Robbins were friends, Gross may indeed have had more sinister motives than attempting to break up the fight. Because of this, he may very not have been as steady on his feet as someone with purer motives."

O.O.3d 401, 381 N.E.2d 184, syllabus. The function of an appellate court when reviewing the sufficiency of the evidence underlying a criminal conviction is "to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

Appellant was tried for a felony-murder conviction pursuant to R.C. 2903.02(B). Under that statute, the state had the burden of proving that appellant caused "the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C.] 2903.03 or 2903.04." The underlying felony was felonious assault. In order to prove felonious assault in violation of R.C. 2903.11, the state was required to prove that appellant "knowingly [c]ause[d] serious physical harm to another[.]" R.C. 2903.11(A)(1).

Thus, "in order to secure a conviction under the felony-murder statute, the state had only to show that appellant knowingly caused serious physical harm to the victim which proximately resulted in the victim's death. * * * The state did not have to prove that appellant knowingly caused the death of the victim." *State v. Bowles* (May 11, 2001), Lake App. No. 99–L–075, unreported, 2001 WL 502042, at * 7.

█ "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." R.C. 2901.22(B). Unlike the higher degree of culpability of "purposely," "knowingly" does not require the specific intent to commit the crime. *State v. Jones* (Sept. 7, 1999), Butler App. No. CA98–10–222, unreported, at 11, 1999 WL 699865. "Under the common law, crimes committed with 'knowledge' were classified as crimes of general intent, and culpability could be inferred from the voluntary performance of the act itself * * *, 'regardless of [the defendant's] purpose' in so doing." *State v. Cartellone* (1981), 3 Ohio App.3d 145, 148, 3 OBR 163, 166, 444 N.E.2d 68, 72.

In *State v. Purdon* (Nov. 10, 1997), Brown App. No. CA97–03–009, unreported, 1997 WL 700077, the defendant, without warning, hit the victim in the head with his fist. The blow "dazed" the victim, causing him to collapse and hit his head on the concrete floor of a garage. The victim was bleeding, and a short time later began vomiting. The victim was later found unconscious and transported to the hospital, where it was discovered that the victim had life-threatening bleeding

inside his brain. The victim survived but was left permanently incapacitated due to serious head injuries. At the defendant's jury trial for felonious assault (R.C. 2903.11[A][1] ), the hospital physician testified that the victim had suffered a closed-head injury (where there is no obvious external skull fracture but some internal structure such as the brain is injured). A neurosurgeon testified that the victim's injuries could have been caused by the defendant.

The defendant appealed his felonious assault conviction on the ground, *inter alia,* that it was based upon insufficient evidence. This court upheld the defendant's conviction as follows: "After having viewed the evidence in a light most favorable to [the state], we find that a rational trier of fact could have found the essential elements of felonious assault proven beyond reasonable doubt." *Id.* at 7.

With regard to the felonious assault charge against appellant, the only difference between the case at bar and *Purdon* is that appellant hit his victim in the head with his fist four times rather than once. In light of our holding in *Purdon,* and viewing the evidence in a light most favorable to the state, we find that a rational trier of fact could have found the essential elements of the underlying offense of felonious assault proven beyond reasonable doubt. We further find that there was sufficient evidence to find that appellant caused Gross's death as a proximate result of appellant's felonious assault of Gross. The record shows that by hitting Gross four times in the head with his fist, appellant knocked Gross out, which in turn caused Gross to fall backwards and hit his head on the pavement and ultimately resulted in Gross's death.

In light of all of the foregoing, we therefore find that the trial court did not err by overruling appellant's Crim.R. 29(A) motion for acquittal. Appellant's second assignment of error is overruled.

*Judgment affirmed.*

WILLIAM W. YOUNG, P.J., and VALEN, J., concur.