OPINION *Page 2 
{¶ 1} Defendant-appellant Marion Gray, Jr. appeals from his convictions and sentences in the Richland County Court of Common Pleas on one count of murder, one count of felonious assault, one count of "physical harm" robbery, and one count of "force" robbery. Plaintiff-Appellee is the State of Ohio.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On Friday, March 9, 2007, James Malone and his girlfriend, Kamala Snelling drove to Mansfield, Ohio where they planned to have dinner. On the way, Mr. Malone decided to stop at the B.P. gas station located at Longview Boulevard and North Main Street to buy beer and cigarettes. Mr. Malone got out of the car and went into the convenience store. As she waited in the car, Ms. Snelling saw appellant walk around the driver's side of her car. He was standing with his back to her, and she thought that he was having a conversation with someone in another car. Mr. Malone returned with his purchases and placed them in the car. He then reached into his pocket and pulled out his money to give Kamala twenty dollars. At that time, appellant turned around, reached through the driver's side window, and grabbed several twenty-dollar bills from Mr. Malone's hand. Kamala testified that appellant and Mr. Malone struggled, grabbing at each other's arms; however, appellant was able to rip the money out of Mr. Malone's hands, scratching Mr. Malone's hands in the process. During the struggle, appellant had the upper half of his body inside the car in an unsuccessful attempt to steal Ms. Snelling's purse. Kamala testified that she was able to break up the fight and get appellant out of her car by putting the car in reverse. Appellant withdrew when the car coasted backwards, yelling "[r]un me over, you fucking bitch." (1T. at 275). Kamala was *Page 3 
yelling at James Malone to leave the scene because she was scared that appellant might have a gun. Mr. Malone put the car in drive and pulled out of the B.P. parking lot. However, he became angry over the theft of his money, and decided to get his money back from appellant. Mr. Malone made a U-turn in the road and pulled back into the B.P. parking lot.
 {¶ 3} Sometime around 10:00 p.m., Amber Kanz and Rodney Iceman stopped at the B.P. station. Mr. Iceman got out of the car to go to the convenience store. While Amber was waiting in the car, appellant got into the passenger side of the car and demanded her purse. When she refused, appellant tried to take it from her. Ms. Kanz testified that she grabbed her purse and pulled back. At the same time, she was yelling in an attempt to get Mr. Iceman's attention. Mr. Iceman ran back to the car, and pulled appellant out. The two men briefly fought before Amber Kanz honked her car horn, scaring appellant into leaving.
 {¶ 4} Amber testified that after the confrontation between Rodney Iceman and appellant, she backed her car out of the parking space. However, before she left the parking lot, she saw James Malone and Kamala Snelling pulling into the gas station. Rodney Iceman yelled Mr. Malone's name, but was unable to get his attention. They saw Mr. Malone park his car, get out, and engage in a confrontation with appellant.
 {¶ 5} Kamala Snelling testified that appellant approached Mr. Malone as soon as he got out of the car. At that time, Kamala heard Mr. Malone say that he wanted his money back. Appellant and James Malone then began to argue and push each other until they were standing behind Ms. Snelling's car. At some point during this confrontation, Amber Kanz approached Kamala Snelling to ask what was going on. She *Page 4 
stated that she planned to call the police; however, she did not make the call because Mr. Iceman said that he had warrants out for his arrest. Tracy Cox, another bystander, also witnessed this confrontation between appellant and Mr. Malone, and, at one point, told the convenience store clerk to call the police.
 {¶ 6} Kamala Snelling, Amber Kanz, and Tracy Cox all testified that they saw appellant punch Mr. Malone several times in the head before he fell and hit his head on the pavement. Ms. Snelling testified that the first punch knocked Mr. Malone onto his hands and knees. As he struggled to get back up, appellant punched him a second time on the forehead. This blow threw Mr. Malone back, causing him to strike his head hard on the pavement.
 {¶ 7} Amber Kanz testified that appellant punched Mr. Malone in the head, knocking him down. Appellant punched Mr. Malone again as he tried to get up, causing Mr. Malone to strike his head on the pavement.
 {¶ 8} Tracy Cox testified that appellant was "beating the tar" out of James Malone. She indicated that the second or third punch knocked Mr. Malone off his feet, and she heard his head smack on the pavement.
 {¶ 9} Kamala Snelling testified that as she ran over to where Mr. Malone was laying, she heard appellant yell "I think I killed that son of a bitch." (1T. at 280). At that point, Tracy Cox testified that she saw appellant run over to the open driver's side door of the victim's car, reach under the seat and grab something. As bystanders attempted to help Mr. Malone, appellant jumped into a waiting car and fled the scene. Amber Kanz and Rodney Iceman also left before police arrived because they thought Mr. Malone would be okay. *Page 5 
 {¶ 10} Appellant did not argue that he acted in self-defense or that he was provoked; rather he testified that the decedent slipped and fell causing the injury to his head. (4T. at 975-976; 979-980; 980-981; 988; 992; 1015). Appellant denied ever striking Mr. Malone.
 {¶ 11} Mr. Malone was unresponsive after the incident, and never regained consciousness. He was transported to Med Central Hospital were emergency surgery was performed in an attempt to reduce the swelling on his brain. However, due to his massive head injuries, Mr. Malone was ultimately declared brain dead and was removed from life support on March 15, 2007. An autopsy revealed injuries consistent with Mr. Malone being struck in the face with massive force before falling and hitting his head on the pavement. Forensic Pathologist Dr. William Cox testified that the blow to the face alone caused sufficient damage to result in Mr. Malone's death.
 {¶ 12} Appellant was initially arrested on a warrant for felonious assault. After Mr. Malone's death, he was indicted by the Richland County Grand Jury on one count of aggravated robbery, one count of robbery alleging that he caused physical harm to James Malone while committing a theft offense, one count of robbery alleging that he used force against Amber Kanz while attempting to commit a theft offense, one count of felonious assault, and one count of felony murder.
 {¶ 13} The jury found appellant guilty of the physical harm robbery of James Malone, the force robbery of Amber Kanz, the felonious assault of James Malone, and the murder of James Malone. He was acquitted on the charge of aggravated robbery. The trial court sentenced appellant to seventeen years to life. *Page 6 
 {¶ 14} Appellant timely appeals and raises the following five assignments of error:
 {¶ 15} "I. THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING THE PROSECUTION'S MOTION IN LIMINE, PREVENTING THE DEFENSE FROM INTRODUCING RELEVANT EVIDENCE OF THE VICTIM'S PRIOR CRIMINAL RECORD.
 {¶ 16} "II. APPELLANT'S CONVICTIONS ON THE CHARGES OF MURDER, FELONIOUS ASSAULT, AND ROBBERY ARE CONTRARY TO THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE PRESENTED AT TRIAL, THUS DENYING DEFENDANT A FAIR TRIAL AND DUE PROCESS OF LAW.
 {¶ 17} "III. THE TRIAL COURT DEPRIVED APPELLANT OF A FAIR TRIAL AND DUE PROCESS OF LAW IN ITS DENIAL OF APPELLANT'S MOTION FOR JUDGMENT OF ACQUITTAL.
 {¶ 18} "IV. APPELLANT WAS DEPRIVED OF A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED BY THE OHIO AND U.S. CONSTITUTIONS, AS A RESULT OF THE INEFFECTIVE ASSISTANCE OF COUNSEL ARISING FROM COUNSEL'S FAILURE TO RENEW HIS MOTION FOR JUDGMENT OF ACQUITTAL AT THE CLOSE OF THE STATE'S CASE AND IN HIS COUNSEL'S LIMITATION OF HIS MOTION FOR JUDGMENT OF ACQUITTAL TO THE CHARGE OF MURDER.
 {¶ 19} "V. THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING TESTIMONY OF PRIOR CONSISTENT STATEMENTS OF A PROSECUTION WITNESS." *Page 7 
 I. {¶ 20} In his first assignment of error, appellant challenges the trial court's exercise of its discretion in excluding evidence of the decedent's violent character, offered in the form of testimony concerning the decedent's prior conviction for a 1979 felony drug possession, a 1984 conviction for obstructing official business, misdemeanor convictions for driving while intoxicated, and disorderly conduct, a 1999 conviction for assault on a peace officer and a 2001 conviction for having a weapon while under disability, in support of his claim that a robbery did not occur; rather this was a drug deal gone bad.
 {¶ 21} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987),31 Ohio St. 3d 173, paragraph two of the syllabus. Therefore, we will not disturb a trial court's evidentiary ruling unless we find the trial court abused its discretion. State v. Martin (1985), 19 Ohio St. 3d 122,129. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151,157.
 {¶ 22} Every criminal defendant has a constitutional right to present a meaningful defense. Crane v. Kentucky (1986), 476 U.S. 683, 690,106 S.Ct. 2142. However, this right does not engender an unfettered entitlement to the admission of any and all evidence. U.S. v.Scheffer (1998), 523 U.S. 303, 308, 118 S.Ct. 1261.
 {¶ 23} Evid. R. 404 and 405 govern the matters of when and how character evidence may be adduced in support of a claim of self-defense. Evid. R. 404 provides in part: *Page 8 
 {¶ 24} "(A) Character evidence generally
 {¶ 25} "Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, subject to the following exceptions:
 {¶ 26} " * * *
 {¶ 27} "(2) Character of victim. Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor is admissible; * * *.
 {¶ 28} "(B) Other crimes, wrongs or acts.
 {¶ 29} "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 30} Thus, Evid. R. 404 provides that character evidence is admissible for some limited purposes. Evid. R. 405 then sets forth two methods by which character may be proved-opinion and reputation, and specific acts evidence-and when each type is admissible. That rule provides:
 {¶ 31} "(A) Reputation or opinion
 {¶ 32} "In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony *Page 9 
in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
 {¶ 33} "(B) Specific instances of conduct
 {¶ 34} "In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct."
 {¶ 35} Appellant's trial counsel conceded that he had no proof that Malone had in fact been convicted of a felony drug possession in 1979; rather he had information only that Malone had been charged with felony drug possession. (3T. at 931-932). Accordingly, the trial court did not abuse its discretion by excluding evidence that Malone had been charged in 1979 with felony drug possession.
 {¶ 36} According to Evid. R. 609(A) (1) and subject to Evid. R. 403, "evidence that a witness other than the accused has been convicted of a crime is admissible if the crime was punishable by death or imprisonmentin excess of one year * * *." (Emphasis added.). Accordingly, the trial court did not abuse its discretion in excluding the decedent's misdemeanor convictions.
 {¶ 37} In the case at bar, appellant did not argue that he acted in self-defense or that he was provoked; rather he claimed the decedent slipped and fell causing the injury to his head. (4T. at 975-976; 979-980; 980-981; 988; 992; 1015). Accordingly, the prior convictions are not admissible to show appellant's state of mind.
 {¶ 38} The relevant inquiry in a case such as this is whether a victim's character or character trait is an essential element of a defense. If the proof or failure of proof of the victim's character would not be dispositive of an element of a defense, then it is not *Page 10 
an essential component of the defense and falls outside the limited scope of Evid. R. 405(B). Cf. State v. Barnes, 94 Ohio St.3d 21, 24,2002-Ohio-68, 759 N.E.2d 1240, 1244. Evid. R. 405(B) precludes a defendant from introducing specific instances of the victim's conduct to prove that the victim was the initial aggressor. Id. at 24,759 N.E.2d at 1244. Similarly, specific instances of a victim's violent propensities and drug usage in the past does not prove an element of the claim that the decedent wanted money back that he allegedly had given appellant for crack cocaine. A defendant may successfully assert such a defense to a charge of robbery without resort to proving any aspect of a victim's character. Therefore, Evid. R. 405(B) precludes a defendant from introducing specific instances of the victim's conduct to prove that the victim's claim that he had been robbed was a cover-up for a drug deal gone bad.
 {¶ 39} However, even if the trial court erred in excluding this evidence from trial, we must review the exclusion of this evidence under the harmless error standard. Crim. R. 52(A), which governs the criminal appeal of a non-forfeited error, provides that "[a]ny error * * * which does not affect substantial rights shall be disregarded." (Emphasis added.) Thus, Crim. R. 52(A) sets forth two requirements that must be satisfied before a reviewing court may correct an alleged error. First, the reviewing court must determine whether there was an "error"-i.e., a "[deviation from a legal rule." United States v. Olano (1993),507 U.S. 725, 732-733, 113 S.Ct. 1770, 123 L.Ed.2d 508. Second, the reviewing court must engage in a specific analysis of the trial court record-a so-called "harmless error" inquiry-to determine whether the error "affect[ed] substantial rights" of the criminal defendant. In U.S. v.Dominguez Benitez (June 14, 2004), 542 U.S. 74, 124 S.Ct. 2333,159 L.Ed.2d 157, the Court defined the prejudice prong of the *Page 11 plain error analysis, "It is only for certain structural errors undermining the fairness of a criminal proceeding as a whole that evenpreserved error requires reversal without regard to the mistake's effect on the proceeding. See Arizona v. Fulminante, 499 U.S. 279, 309-310
(1991) (giving examples). Otherwise, relief for error is tied in some way to prejudicial effect, and the standard phrased as `error that affects substantial rights,' used in Rule 52, has previously been taken to mean error with a prejudicial effect on the outcome of a judicial proceeding. See Kotteakos v. United States, 328 U.S. 750 (1946). To affect `substantial rights,' . . . error must have `substantial and injurious effect or influence in determining the . . . verdict.'Kotteakos, supra, at 776." 124 S.Ct. at 2339. [Emphasis added]. See, also, State v. Barnes (2002), 94 Ohio St.3d 21, 759 N.E.2d 1240. See, also, State v. Fisher, 99 Ohio St.3d 127, 129, 2003-Ohio-2761 at ¶ 7,789 N.E.2d 222, 224-225. Thus, a so-called "[t]rial error" is, "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." Fulminante, 499 U.S. at 307-308,111 S.Ct. 1246, 113 L.Ed.2d 302.
 {¶ 40} "A fundamental premise of our criminal trial system is that `the jury is the lie detector.' United States v. Barnard, 490 F. 2d 907,912 (C.A.9 1973) (emphasis added), cert. denied, 416 U.S. 959,94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Determining the weight and credibility of witness testimony, therefore, has long been held to be the `part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.' Aetna Life Ins. Co. v. Ward, 140 U.S. 76, 88,11 S.Ct. 720, 724-725, 35 L.Ed. 371 (1891)". *Page 12 United States v. Scheffer (1997), 523 U.S. 303, 313, 118 S.Ct. 1261,1266-1267. The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. State v. Jamison (1990),49 Ohio St.3d 182, certiorari denied (1990), 498 U.S. 881.
 {¶ 41} Several expert witnesses testified regarding the results of toxicology tests performed on James Malone. Forensic pathologist, Dr. William Cox, testified that he reviewed the toxicology report on James Malone as a part of the autopsy procedure. (2T. at 524-525). He indicated that according to the report, Mr. Malone's blood alcohol level was .20 at the time he was admitted to the hospital. (2T. at 525). Forensic toxicologist, Dr. John Wyman also testified regarding the testing he performed on blood and urine samples taken from the victim when he arrived at Med Central Hospital. (2T. at 570-571). Dr. Wyman testified that Mr. Malone's admitting urine sample also tested positive for cocaine and cocaine metabolite, and contained ethanol alcohol in the amount of 0.21 gram per percent. (2T. at 572-573). Based upon these findings, Dr. Wyman testified that James Malone had ethanol alcohol and cocaine in his system at the time he was injured. However, because the positive cocaine screen of his blood may have picked up inactive metabolites, Dr. Wyman was unable to testify that Mr. Malone was under the influence of cocaine. (2T. at 574-575). He could only say that the victim had been exposed to cocaine within seventy-two hours prior to his injury. (2T. at 575-576).
 {¶ 42} Appellant was given broad latitude to explore his accident and/or "drug deal gone bad" theory. After Rodney Iceman testified on direct examination that he was a cocaine user and had seen James Malone use cocaine on occasion, appellant's trial *Page 13 
counsel asked Mr. Iceman if he was going to the B.P. station with $100.00 in his pocket at 10:30 p.m. on March 9, 2007 to buy cocaine. (2T. at 442, 445-446, 471). Mr. Iceman responded that he was not planning to buy drugs, or even go to the B.P. station until Amber Kanz picked him up. (2T. at 471). After Mr. Iceman admitted on cross-examination that he knew appellant was involved with cocaine and James Malone used cocaine, Mr. Iceman was asked if it would be logical for him to assume when he saw Mr. Malone talking to appellant that they were talking about cocaine. (2T. at 481-482). Mr. Iceman responded that it did not cross his mind because appellant was known to use cocaine, not sell it. (2T. at 482-483).
 {¶ 43} Appellant was also permitted to cross-examine Amber Kanz regarding her involvement with drugs and possible drug activity at the B.P. station on the night of March 9, 2007. After Ms. Kanz testified on direct examination regarding an encounter with appellant while she was visiting her boyfriend in jail, she was asked by appellant's trial counsel if her boyfriend was a convicted drug dealer. (3T. at 698-700, 705). She responded, "That is what they say." (Id. at 705). Ms. Kanz denied being involved with drugs. (Id. at 706). Ms. Kanz was also asked if she knew that Rodney Iceman and James Malone used cocaine. (3T. at 715). She replied that she had heard Mr. Iceman used cocaine before, but stated that she did not know that Mr. Malone was a cocaine user at the time of the incident. (Id.).
 {¶ 44} Finally, appellant testified and presented his "drug deal gone bad"/accident claims to the jury. (4T. at 975-976; 979-980; 980-981; 988; 992; 1015).
 {¶ 45} The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the *Page 14 
inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". State v. Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, citing State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236 Indeed, the jurors need not believe all of a witness's testimony, but may accept only portions of it as true. State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v. Anf/7/(1964), 176 Ohio St. 61, 67,197 N.E.2d 548.; State v. Burke, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing State v. Caldwell (1992), 79 Ohio App. 3d 667, 607N.E.2d 1096. Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence.State v. Jenks (1991), 61 Ohio St. 3d 259, 574 N.E. 2d 492.
 {¶ 46} In the case at bar, the jury heard the witnesses, evaluated the evidence, and was convinced of appellant's guilt.
 {¶ 47} Accordingly, we find no manifest injustice occurred. We therefore find no reasonable possibility had the jury been permitted to hear testimony of the decedent's prior convictions they would have found appellant not guilty, and hold that any error committed was harmless beyond a reasonable doubt. State v. Lytle (1976), 48 Ohio St.2d 391,403, 358 N.E.2d 623, 630-631, vacated on other grounds (1978),438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154.
 {¶ 48} Appellant's first assignment of error is overruled.
 II., III., IV. {¶ 49} Appellant has argued his second, third and fourth assignments of error collectively. *Page 15 
 {¶ 50} In his second assignment of error, appellant argues that his convictions are against the manifest weight and sufficiency of the evidence. In his third assignment of error appellant contends that the trial court erred by not granting his Crim. R. 29 motion for acquittal on the charge of murder made at the close of the State's case-in-chief. In his fourth assignment of error appellant contends he was denied effective assistance of trial counsel because counsel failed to renew his motion for acquittal at the close of the defense case and to include in that motion a motion to acquit appellant on the robbery charge.
 {¶ 51} Under Crim. R. 29, a trial court, on a defendant's motion or its own motion, "after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses." Crim. R. 29(A).The standard to be employed by a trial court in determining a Crim. R. 29 motion is set out in State v. Bridgeman (1978),55 Ohio St.2d 261, syllabus:
 {¶ 52} "Pursuant to Crim. R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."
 {¶ 53} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89,1997-Ohio-355, 684 N.E.2d 668. "While the test for sufficiency requires a *Page 16 
determination of whether the State has met its burden of production at trial, a manifest weight challenges questions whether the State has met its burden of persuasion." State v. Thompkins, supra at 78 Ohio St.3d 390.
 {¶ 54} In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v.Jenks (1991), 61 Ohio St.3d 259, superseded by State constitutional amendment on other grounds as stated in State v. Smith (1997),80 Ohio St. 3d 89.
 {¶ 55} Specifically, an appellate court's function, when reviewing the sufficiency of the evidence to support a criminal conviction, is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks, supra. This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172, 175. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Thompkins, 78 Ohio St. 3d at 386.
 {¶ 56} The Ohio Supreme Court recently addressed the standard of review for a criminal manifest weight challenge, as follows:
 {¶ 57} "The criminal manifest-weight-of-the-evidence standard was explained in State v. Thompkins (1997), 78 Ohio St.3d 380,678 N.E.2d 541. In Thompkins, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. Id. at 386, *Page 17 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. Id. at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. Id. at 387,678 N.E.2d 541. `When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the fact finder's resolution of the conflicting testimony.' Id. at 387,678 N.E.2d 541, citing Tibbs v. Florida (1982), 457 U.S. 31, 42,102 S.Ct. 2211, 72 L.Ed.2d 652.
 {¶ 58} "Both C.E. Morris Co., 54 Ohio St.2d 279, 8 O.O.3d 261,376 N.E.2d 578, and Thompkins instruct that the fact-finder should be afforded great deference. However, the standard in C.E. Morris Co. tends to merge the concepts of weight and sufficiency. See State v. Maple
(Apr. 2, 2002), 4th Dist. No. 01CA2605, 2002 WL 507530, fn. 1; State v.Morrison (Sept. 20, 2001), 10th Dist. No. 01AP-66, 2001 WL 1098086. Thus, a judgment supported by "some competent, credible evidence going to all the essential elements of the case" must be affirmed. C.E. MorrisCo. Conversely, under Thompkins, even though there may be sufficient evidence to support a conviction, a reviewing court can still re-weigh the evidence and reverse a lower court's holdings. State v.Thompkins, 78 Ohio St.3d 380, 678 N.E.2d 541. Thus, the civil-manifest-weight-of-the-evidence standard affords the lower court more deference then does the criminal standard. See Barkley v.Barkley (1997), 119 Ohio App.3d 155, 159, *Page 18 
694 N.E.2d 989." State v. Wilson, 713 Ohio St.3d 382, 387-88, 2007-Ohio-2202
at ¶ 25-26; 865 N.E.2d 1264, 1269-1270.
 {¶ 59} However, an appellate court may not merely substitute its view for that of the jury, but must find that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins, supra,78 Ohio St. 3d at 387. (Quoting State v. Martin (1983),20 Ohio App. 3d 172, 175, 485 N.E.2d 717, 720-721). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id.
 {¶ 60} In State v. Thompkins supra, the Ohio Supreme Court held "[t]o reverse a judgment of a trial court on the basis that the judgment is not sustained by sufficient evidence, only a concurring majority of a panel of a court of appeals reviewing the judgment is necessary." Id. at paragraph three of the syllabus. However, to "reverse a judgment of a trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required." Id. at paragraph four of the syllabus; State v. Miller (2002), 96 Ohio St.3d 384,2002-Ohio-4931 at ¶ 38, 775 N.E.2d 498.
 {¶ 61} Of relevance to this assignment of error, appellant was convicted of Robbery. R.C. 2911.02(A) (2) provides, "(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following: (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another. . . . (3) Use or threaten the immediate use of force against another." *Page 19 
 {¶ 62} Appellant argues that the State failed to prove the attempted, threatened or actual infliction of "physical harm" occurred during the attempt, the offense, or in fleeing immediately after the attempt or offense. He argues that there was no evidence that he attempted to flee the scene after the robbery, and that the robbery was completed when Mr. Malone left the scene. Therefore, the injuries suffered by Mr. Malone when he returned to the scene and confronted the appellant cannot serve as the physical harm necessary for the robbery. The robbery, in turn, could not then serve as the predicate offense for the murder charge because of the break in causation between the robbery and the infliction of the fatal blows.
 {¶ 63} Kamala Snelling, testified that when they drove to Mansfield on the evening of March 9, 2007, James Malone had at least $100.00 in twenty-dollar bills. (1T. at 265). Ms. Snelling also had a purse, which contained approximately twenty dollars. (1T. at 265-266). Ms. Snelling testified appellant turned around reached through the open driver's side window, and grabbed the money in Mr. Malone's hands. (1T. at 272-273). According to Ms. Snelling, appellant had his whole body from the waist up inside her vehicle, and he was struggling with Mr. Malone. (1T. at 273-274). During the struggle, appellant reached across and tried to grab her purse, which was sitting on the passenger side floor. She was able to grab her purse so he could not take it. (1T. at 274). However, Ms. Snelling testified that appellant was able to take seventy or eighty dollars from Mr. Malone. (1T. at 275).
 {¶ 64} Viewing this evidence in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant had committed, or had attempted to commit a theft offense. *Page 20 
 {¶ 65} We hold, therefore, that the state met its burden of production regarding attempting or committing a theft offense as required by R.C. 2911.02(A) (2).
 {¶ 66} Kamala Snelling testified that the two men struggled when appellant dived though the window of her car and stole Mr. Malone's money. (1T. at 272-275). She indicated that during the struggle, their arms and hands were going all over the place, and Mr. Malone was fighting to get appellant out of the car. (1T. at 273-274). Despite Mr. Malone's efforts, appellant was able to rip the money out of Mr. Malone's hands. (1T. at 274).
 {¶ 67} This testimony is consistent with injuries to Mr. Malone's hands that were observed at the hospital after his death. Robert Ball, an investigator with the Richland County Coroner's Office, identified State's Exhibits 5-O and 5-P as photographs that he took of injuries to James Malone's right hand. (2T. at 608-609). Mr. Ball indicated that based upon his law enforcement experience, the wounds appear to be defensive wounds from some type of altercation. While appellant denied that he ripped money out of Mr. Malone's hands, he was unable to explain how Mr. Malone suffered the scratches to his hands. (4T. at 1017-1018).
 {¶ 68} R.C. 2901.01 states, in relevant part: "(A) As used in the Revised Code:
 {¶ 69} "(3) `Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration".
 {¶ 70} The Legislative Service Commission comments further states: "`Physical harm to persons' is conceived as personal, physical harm including, but not limited to, personal injury. In the context of tort law personal injury implies a trauma, but in the context of the criminal law a precedent trauma is not viewed as a necessary *Page 21 
requirement before it can be held that personal harm is caused or threatened, such as when an offender deliberately, through other than traumatic means, sets out to drive his victim mad or arranges for his victim to contract pneumonia".
 {¶ 71} This court has previously held that "no showing of actual trauma or injury is needed to satisfy the `physical harm' element of assault. The qualification of the physical contact as `physical harm" is a matter to be determined by the trier of fact". State v. Robinson
(Sept. 30, 1985), 5th Dist. No. CA-6649; State v.Dansby (June 15, 1988), 5th Dist. No. 87AP090068. See, also State v. Perkins (March 27, 1998), 11th District No. 96-P-0221("When there is no tangible, physical injury such as a bruise or cut, it becomes the province of the jury to determine whether, under the circumstances, the victim was physically injured, after reviewing all of the evidence surrounding the event"); State v. Bowers, 11th Dist. No. 2002-A-0010, 2002-Ohio-6913 at ¶ 15 ("In the instant case, the victim attested that appellant tackled him without his permission causing him to fall to the ground. The victim stated that he was not injured or bruised as a result of the incident; however, he attested that he experienced pain in his stomach and side when he was tackled. Reviewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that appellant inflicted physical harm on Boggs, as provided in R.C. 2901.22, and knowingly caused Boggs physical harm, as provided in R.C. 2901.01(A)(3)") .
 {¶ 72} Viewing the evidence in the case at bar in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant had caused physical harm to another. *Page 22 
 {¶ 73} We hold, therefore, that the State met its burden of production regarding inflict, attempt to inflict, or threaten to inflict physical harm on another as required by R.C. 2911.02(A) (2) and, accordingly, there was sufficient evidence to support appellant's conviction.
 {¶ 74} Appellant was also convicted of felony murder as defined in R.C. 2903.02(B), which provides in pertinent part:
 {¶ 75} "(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree. . . ."
 {¶ 76} Felonious assault, as well as robbery, was the underlying offense of violence. Felonious assault, a second-degree felony, is defined by R .C. 2903.11:
 {¶ 77} "(A) No person shall knowingly do either of the following:
 {¶ 78} "(1) Cause serious physical harm to another or to another's unborn;
 {¶ 79} "(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordinance * * *"
 {¶ 80} R.C. 2901.22 defines "knowingly" as follows:
 {¶ 81} "(B) A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." Whether a person acts knowingly can only be determined, absent a defendant's admission, from all the surrounding facts and circumstances, including the doing of the act itself." State v. Huff (2001),145 Ohio App. 3d 555, 563, 763 N.E.2d 695. (Footnote omitted.) Thus, "[t]he test for whether a *Page 23 
defendant acted knowingly is a subjective one, but it is decided on objective criteria." State v. McDaniel (May 1, 1998), Montgomery App. No. 16221, (citing State v. Elliott (1995), 104 Ohio App.3d 812,663 N.E.2d 412).
 {¶ 82} Under the felony murder statute a defendant may be found guilty of murder even if he did not "intend" to cause the victim's death.State v. Miller, 96 Ohio St.3d 384, 775 N.E.2d 498, 2002-Ohio-4931, at ¶¶ 31-34. The critical issue is whether the defendant had the requisite culpable mental state to support a conviction for the underlying felony offense. Id. See, also, State v. Berry, Cuyahoga App. No. 83756,2004-Ohio-5485, at ¶ 35, citing State v. Irwin, Hocking App. Nos. 03CA13 03CA14, 2004-Ohio-1129. Felony murder as defined in R.C. 2903.02(B), with the underlying offense of violence being felonious assault, is supported by evidence that establishes that the defendant knowingly caused serious physical harm to the victim. As the Ohio Supreme Court explained in Miller, supra, "a person acts knowingly, regardless ofpurpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." State v. Miller,96 Ohio St.3d 384, 775 N.E.2d 498, 2002-Ohio-4931, at ¶ 31 (emphasis in original).
 {¶ 83} R.C. 2901.01(A)(5) defines serious physical harm as" * * * (b) any physical harm that carries a substantial risk of death; (c) any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity * * *."
 {¶ 84} In the case at bar, appellant knowingly caused serious physical harm to the victim that proximately resulted in the victim's death, and thus supported appellant's conviction for murder. There was evidence that appellant punched Malone two times in *Page 24 
the head, that appellant knocked Malone out, that Malone fell backwards as a result, that Malone hit his head on the pavement as a result of his unconscious fall, and that the injury suffered when Malone's head struck the pavement caused Malone's death. State v. Sutton (2001),145 Ohio App. 3d 408, 416, 763 N.E.2d 222, 228-229.
 {¶ 85} Ms. Snelling testified that as she turned to watch through the back window, she saw appellant hit Mr. Malone hard in the side of the head with his fist. (1T. at 278). When she saw Mr. Malone go down onto his hands and knees, she started to get out of the car. (1T. at 279). Ms. Snelling indicated that at that point, Mr. Malone was trying to get back up, but she could tell that he-was "pretty dizzy." (1T. at 279). As soon as Mr. Malone was able to stand back up, appellant hit him on the forehead. This blow threw Mr. Malone back, causing him to strike his head hard on the pavement. (1T. at 279-280). Ms. Snelling testified that as she ran over to where Mr. Malone was laying, she heard appellant yell "I think I killed that son of a bitch." (1T. at 280). He then jumped into a waiting car and fled the scene. (1T. at 280).
 {¶ 86} Amber Kanz testified that when she looked back, she saw appellant punch Mr. Malone in the head, knocking him down. (3T. at 692). Ms. Kanz testified that appellant could have just walked away because Mr. Malone was on the ground, but he did not. Instead, as Mr. Malone tried to get back up, appellant hit him again, causing Mr. Malone to strike his head on the pavement. (3T. at 692-693, 697-698).
 {¶ 87} Tracy Cox testified the black man was "beating the tar" out of the white man. (3T. at 648-649). She testified that the second or third punch thrown by the black man "literally knocked the [white] man off his feet." (3T. at 649). His feet came out from underneath him, and she heard the echo of him hitting his head on the pavement all the *Page 25 
way across the parking lot. (3T. at 649). Ms. Cox indicated that the white man hit the pavement so hard that "his legs literally jerked." (3T. at 649).
 {¶ 88} Dr. William Cox testified that James Malone died as a result of blunt force trauma to his head that caused bruising, swelling, and internal bleeding to his brain. (2T. at 504-505). He observed multiple fractures to the forehead area of the victim's skull that were consistent with blows to the face. (2T. at 507-508, 509). The force of those blows caused extensive damage and contusions to the left frontal lobe and the temporal lobe of the victim's brain. (2T. at 509). Additionally, Dr. Cox noted massive injures to the opposite side of the victim's brain that are consistent with a contra-coup injury. This type of injury would be caused when the victim fell backward and hit his head, causing his brain to gyrate and ricochet off the front of the skull. (2T. at 509-510).
 {¶ 89} Dr. Cox opined that the injuries to the victim's brain are consistent with the victim being punched very hard in the face or head area, and then falling backward and cracking his skull on the pavement. (2T. at 511-512, 522-523). He ruled out the possibility that the victim merely fell backwards without being struck based upon the black and blue coloration to the victim's upper and lower eyelids visible in State's Exhibit 5-O. (T. 514). This bruising is consistent with the skull fractures to the frontal facial structures, as well as intermediary contusions to the victim's brain that indicate a direct impact to the forehead area. (2T. at 514-515). Dr. Cox testified that it would take a substantive amount of force to the frontal portion of the victim's head to cause these injuries, and that they would have resulted from the blows prior to the fall. (2T. at 516-518). He further testified that in his expert opinion, the blows to the face alone would have been sufficient to cause Mr. Malone's death. (2T. at 527-528). *Page 26 
 {¶ 90} Appellant denied ever striking appellant. Instead, he argued that Mr. Malone slipped and fell causing his head to strike the pavement. (4T. at 975-976; 979-980; 980-981; 988; 992; 1015).
 {¶ 91} The evidence indicates that appellant continued to punch Mr. Malone after the first forceful blow, which knocked Malone off his feet. He also struck Mr. Malone with such force that it caused multiple fractures to the forehead area as well as extensive damage and contusions to the left frontal lobe and the temporal lobe of the victim's brain. It is apparent that appellant intended to injure Mr. Malone. State v. Watson, Cuyahoga App. No. 87281, 2006-Ohio-5738
at ¶ 20; State v. Sutton, supra, 145 Ohio App.3d at 416, 7623 N.E.2d at 228-229.
 {¶ 92} Viewing the evidence in the case at bar in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that appellant knowingly caused serious physical harm to Malone.
 {¶ 93} We hold, therefore, that the State met its burden of production regarding felony murder as defined in R.C. 2903.02(B), with the underlying offense of violence being felonious assault and, accordingly, there was sufficient evidence to support appellant's conviction.
 {¶ 94} A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry in whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. Lockhart v. Fretwell (1993), 506 U.S. 364,113 S.Ct. 838, *Page 27 122 L.Ed.2d 180; Strickland v. Washington (1984), 466 U.S. 668,104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley (1989), 42 Ohio St.3d 136.
 {¶ 95} Because we have found no instances of error in this case, we find appellant has not demonstrated that he was prejudiced by trial counsel's performance.
 {¶ 96} Appellant's second, third and fourth assignments of error are overruled.
 V. {¶ 97} In his fifth assignment of error, appellant maintains that the trial court abused its discretion in allowing Detective Chad Brubaker to testifying concerning the substance of Rodney Iceman's statement concerning the fatal encounter that Iceman gave to the police on March 23, 2007. Appellant argues that the trial court erred in allowing the testimony concerning a prior consistent statement when there was no claim of recent fabrication or of improper influence or motive. We disagree.
 {¶ 98} In Rigby v. Lake Cty. (1991), 58 Ohio St.3d 269, 271,569 N.E.2d 1056, 1058, the Supreme Court reaffirmed the longstanding test for appellate review of admission of evidence:
 {¶ 99} "Ordinarily, a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence. The admission of relevant evidence pursuant to Evid. R. 401 rests within the sound discretion of the trial court. E.g., State v.Sage (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. An appellate court that reviews the trial court's admission or exclusion of evidence must limit its review to whether the lower court abused its discretion. State v. Finnerty (1989),45 Ohio St.3d 104, 107, 543 N.E.2d 1233, 1237. As this court has *Page 28 
noted many times, the term `abuse of discretion' connotes more than an error of law; it implies that the court acted unreasonably, arbitrarily or unconscionably. E.g., Blakemore v. Blakemore (1983),5 Ohio St. 3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142." Since the trial court has such broad discretion, the appellate court should be slow to interfere unless the court has clearly abused its discretion and a party has been materially prejudiced thereby. Cleveland v. Petko (1996),112 Ohio App.3d 670, 676, 679 N.E.2d 1162, 1166, quoting Shimola v.Cleveland (1992), 89 Ohio App.3d 505, 511, 625 N.E.2d 626, 629-630. The trial court must determine whether the probative value of certain evidence and/or testimony is substantially outweighed by the danger of unfair prejudice or of confusing or misleading the jury. Id.
 {¶ 100} "A trial court has broad discretion in determining whether to admit or exclude evidence. Absent an abuse of discretion that materially prejudices a party the trial court's decision will stand."Krischbaum v. Dillon (1991), 58 Ohio St.3d 58, 66, 567 N.E. 2d 1291
(citations omitted). A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140
(citations omitted). In applying the abuse of discretion standard, an appellate court is not free to substitute its own judgment for that of the trial court. Berk v. Matthews (1990), 53 Ohio St.3d 161, 169,559 N.E.2d 1301 (citations omitted).
 {¶ 101} Evid. R. 801(D) (1) (b) deals with the admission of prior consistent statements by a witness in certain circumstances. Such rule reads, in relevant part, as follows: "(D) Statements which are not hearsay. A statement is not hearsay if: "(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to *Page 29 
cross-examination concerning the statement, and the statement is * * * (b) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive * * *."
 {¶ 102} Such rule permits the "rehabilitation of a witness whose credibility has been attacked by means of a charge that he recently fabricated his story or falsified his testimony in response to improper motivation or influence, . . ." State v. Lopez (1993),90 Ohio App.3d 566, 578, citing Motorists Mut. Ins Co. v. Vance (1985),21 Ohio App.3d 205, 207. The trial court in this matter clearly admitted Rodney Iceman's statement under the belief that defense counsel had insinuated that Iceman's testimony was fabricated. Upon our review of the record, we find that the trial court did not abuse its discretion by permitting Rodney Iceman's prior consistent statement to be used to rehabilitate his testimony pursuant to Evid. R. 801(D) (1) (b). See State v.Mullins (1986), 34 Ohio App. 3d 192, 196-97.
 {¶ 103} In the present case, defense counsel repeatedly questioned Mr. Iceman regarding the fact that he was incarcerated on a material witness warrant arising from this case. He elicited testimony that Mr. Iceman was not happy about being held in jail on this case, and that he wanted to be released. (2T. at 466). Additionally, he elicited testimony that Mr. Iceman was being held solely on the material witness warrant, and that as soon as he testified, he would be released from jail. (2T. at 470). Defense counsel also implied that Mr. Iceman was not a "real reliable person" because he had to be arrested to ensure his appearance at trial. (2T. at 469). Finally, Mr. Iceman was cross-examined regarding whether the incident with James Malone was a "drug deal gone bad" rather than a robbery as he told the police. This line of questioning clearly *Page 30 
implies that Mr. Iceman had a motive to fabricate his testimony to avoid implication in a drug deal, and to be released from jail. Detective Brubaker provided a brief summary of Mr. Iceman's statement, which was consistent with his trial testimony. (3T. at 763-764). We further note that Mr. Iceman did not observe the appellant punch Mr. Malone; however, he did see Malone fall and heard his head strike the pavement. (2T. at 452-453). In addition, Mr. Iceman testified that the statement appellant sought to introduce was consistent with his testimony at trial. (2T. at 457).
 {¶ 104} Moreover, even assuming that Rodney Iceman's prior consistent statement does not fall within Evid. R. 801(D) (1) (b), given the overwhelming evidence of appellant's guilt based upon the testimony of Kamala Snelling, Amber Kanz, and Tracy Cox, we conclude that the admission of the statement had no effect on the outcome of appellant's trial and was, therefore, harmless.
 {¶ 105} Appellant's fifth assignment of error is, therefore, overruled.
 {¶ 106} For the foregoing reasons, the judgment of the Court of Common Pleas, of Richland County, Ohio, is affirmed.
 Gwin, P.J., Wise, J., and Delaney, J., concur *Page 31 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Court of Common Pleas, of Richland County, Ohio, is affirmed. Costs to appellant. *Page 1