The STATE of Ohio, Appellee,

v.

HUFF, Appellant.

[Cite as *State v. Huff* (2001), 145 Ohio App.3d 555.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–000504.

Decided Aug. 31, 2001.

556

*Michael K. Allen,* Hamilton County Prosecuting Attorney, and *James Michael Keeling,* Assistant Prosecuting Attorney, for appellee.

*David C. Wagner,* for appellant.

PAINTER, Judge.

Because the trial court admitted blatantly inadmissible and prejudicial evidence, and because of lapses by defense counsel, we grant a new trial.

## I. The Shootings

At approximately 9:00 p.m. on July 18, 2000, Antwane Johnson, Kenneth Johnson, Terence Johnson,[1] Dion Tillary, Jul Gray, Olondrius Rice, and Charles Winbush were walking down the street when appellant Cleavon Huff confronted them. He asked the adolescents when they were going to assault him. (There had been a fight earlier in the month between Antwane and Huff.) Antwane and Huff fought, and then Gray and Huff fought. After Huff lost the fights, the boys left. Huff yelled threats. He called the boys "hoe-ass niggers" and threatened to "move to the next level."

Within a few hours, the boys were back in the vicinity and saw a male in a black-hooded sweatshirt approach them from across the street. When the person drew closer, they recognized him as Huff. The street was well lit, and they all saw Huff's face. One of the victims recognized Huff's shoes and shorts as being

---

1. We refer to the three adolescents with the same surname by their first names.

identical to those he had been wearing earlier that evening. The man pointed a gun toward the group at a downward angle and asked, "What's up, hoe-ass niggers." When the man began shooting, everyone ran. Kenneth was shot in the arm and the leg. An ambulance took Kenneth, accompanied by Terence, to the hospital. Neither of them was asked to make a pretrial identification of the shooter.

Cincinnati police detective Terry Cox testified that a number of the victims identified the shooter as "Cleavon," but that they were not sure of Cleavon's last name. After "some talk" that the shooter's last name might be Huff, Detective Cox checked the "mug master machine" and located a photograph of Cleavon Huff. He returned to the scene, separated the remaining victims, and individually showed them Huff's photograph. He asked each boy if the boy knew the person in the photograph and each responded, "Yes, that's the guy." The victims were certain of their identification.

Huff testified that Kenneth and his friends had assaulted him during the first altercation on July 18 and that, in response, he had threatened to get his friends. Huff denied threatening to get a gun or to take the incident to another level. He also adduced evidence that, during the time of the second incident that night, he was at the home of his friend Ronnie Chatman, listening to music, playing videogames, and lifting weights.

Huff was convicted of five counts of felonious assault in violation of R.C. 2903.11(A)(2) and the accompanying gun specifications, following a jury trial. (Although it is not raised as an assignment, we note that on count seven Huff was indicted for and found guilty of felonious assault of Kenneth in violation of R.C. 2903.11[A][1]. But he was sentenced for violating R.C. 2903.11[A][2].) Huff appeals his conviction, raising three assignments of error.

## II. Ineffective Assistance

In his first assignment of error, Huff gives several examples of what he believes was ineffective assistance of trial counsel. He claims that counsel failed to (1) properly offer impeachment evidence, (2) demand requested discovery from the state until after trial had begun, (3) challenge the suggestiveness of Huff's pretrial identification, (4) elicit the fact that Huff's alibi witness had no criminal record, and (5) object to impermissible testimony by the state's witnesses. In his second assignment, he claims that the trial court abused its discretion in admitting evidence concerning his tattoo. In his third assignment, Huff claims that he was not given credit for the time he had served in a juvenile facility awaiting his bindover hearing.

To prevail on his claims of ineffective assistance of counsel, Huff "must show that counsel's representation fell below an objective standard of reasonableness," [2] and that he was prejudiced by counsel's deficient performance. [3] To demonstrate prejudice, Huff "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." [4] (The United States Supreme Court recently clarified that this standard, and not a fundamental-fairness test, is the correct test for resolving the majority of ineffective-assistance-of-counsel claims.[5]) Failure to prove one prong "negates a court's need to consider the other." [6] We first address the ineffective-assistance-of-counsel claims that we deem to have merit.

Huff claims that his counsel was ineffective for failing to properly elicit from his alibi witness the fact that the witness had no prior criminal record. He also claims that trial counsel was ineffective for failing to inform the court that he had not received the state's discovery response regarding the felony records of any of the testifying victims until after trial had commenced and the witnesses had testified. Huff claims that he was prejudiced because the failure to obtain the discovery resulted in defense counsel lacking knowledge that the victims had no felony records (they did not). Consequently, his counsel asked Detective Cox whether the victims had prior records, and that opened the door to allow the state to question Detective Cox as to his opinion of the victims' veracity.

The state objected when defense counsel asked the detective whether any of the victims had felony records. The trial court sustained the objection. Defense counsel also asked Detective Cox whether, during the investigation, he had considered the credibility of the victims, to which the detective replied that he had. In response to a question by defense counsel concerning a victim's description of the shooter's clothing, Detective Cox stated that he could not recall

---

2. See *Strickland v. Washington* (1984), 466 U.S. 668, 688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674.

3. See *id.* at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

4. See *id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d 674; *State v. Murphy* (2001), 91 Ohio St.3d 516, 538, 747 N.E.2d 765, 794.

5. See *Williams v. Taylor* (2000), 529 U.S. 362, 391, 120 S.Ct. 1495, 1511–1512, 146 L.Ed.2d 389 (the prejudice test for ineffective assistance of counsel was not modified or supplanted by *Lockhart v. Fretwell* [1993], 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180).

6. See *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52, 64, certiorari denied (2000), 531 U.S. 838, 121 S.Ct. 99, 148 L.Ed.2d 58, citing *Strickland v. Washington* at 697, 104 S.Ct. at 2069, 80 L.Ed.2d 674.

the description, but that he was confident that each victim was telling him the truth. Defense counsel did not ask that the part of the detective's answer vouching for the victims' credibility be stricken.

On redirect examination, the state questioned Detective Cox about the credibility of the victims and whether there was a misidentification of the shooter, without objection by defense counsel. The detective testified that he "absolutely" found the victims credible and that they were telling the truth.

Huff also raises as ineffective assistance the failure of counsel to object to the state's question to Cincinnati Police Lieutenant Donald Smith regarding whether identity was an issue in the case. Lieutenant Smith testified that it was not.

 While defense counsel was deficient in obtaining untimely discovery, that act itself was not prejudicial where the state's witnesses did not have felony records. But counsel's actions and the failure to act as a result of his lack of knowledge were not only deficient, but were also prejudicial. This is also true as to counsel's failure to provide evidence that Chatman, Huff's alibi witness, had no previous criminal record.

 The opinion of a witness as to whether another witness is being truthful is inadmissible.[7] Lieutenant Smith's and Detective Cox's "opinion acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility. * * * In our system of justice, it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of the witnesses."[8] The fact that the vouching witnesses were police officers caused even more of a problem. "[J]urors are likely to perceive police officers as expert witnesses, especially when such officers are giving opinions about the present case based upon their previous experiences with other cases."[9]

 This case was a credibility contest between the victims and their identification of Huff as the shooter and Huff and his alibi witness. Huff's defense was that he was not present and that the witnesses misidentified him as the shooter.

---

7. See *State v. Miller* (Jan. 26, 2001), Montgomery App. No. 18102, unreported, 2001 WL 62793.

8. See *State v. Eastham* (1988), 39 Ohio St.3d 307, 312, 530 N.E.2d 409, 414 (Herbert R. Brown, J., concurring); *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220, modified by *State v. Dever* (1992), 64 Ohio St.3d 401, 596 N.E.2d 436; *State v. Coffman* (1998), 130 Ohio App.3d 467, 720 N.E.2d 545. (Although these cases generally involve experts' statements relating to their opinions as to a child's veracity, the general proposition is just as applicable to this case.)

9. See *State v. Miller*, *supra.*

Identity was the crux of this case. The only other evidence connecting Huff to the shooting was the fact that Huff was at an apartment where the gun used in the shooting was found and that he ran when the police arrived. There was no direct evidence that Huff had handled the gun. Counsel's performance resulted in the improper bolstering of the victims' testimony and the failure to demonstrate the credibility of the alibi witness. We conclude that Huff's counsel's deficient performance was sufficient to undermine confidence in this trial's outcome.

■ Huff also contends that he was denied effective assistance because trial counsel did not lay a proper foundation for impeaching evidence. Kenneth testified at trial that Huff held the gun slanted toward Kenneth's leg and moved it up. On cross-examination, Huff's counsel asked Kenneth whether he previously had testified that he did not believe that the shooter had the intent to harm anyone in the group. The trial court sustained the state's objection to the question, informing counsel that he needed to lay a foundation for that testimony. Counsel terminated his questioning. The state then conducted its redirect examination.

On recross-examination, Huff's counsel attempted to lay a foundation to ask Kenneth about his testimony during Huff's bindover procedure. The trial court sustained the state's objection, explaining that such questioning was beyond the scope of the state's redirect examination. Before Huff's case-in-chief, his counsel attempted to add Kenneth's name to his witness list for the purpose of impeaching Kenneth with his testimony from the bindover proceeding. The court forbade Huff's counsel from impeaching Kenneth with the bindover-proceeding testimony.

The record demonstrates that the failure to impeach Kenneth with his bindover testimony was not a tactical decision. Counsel candidly admitted that he failed to lay a proper foundation for the testimony because he was nervous. Counsel also stated that Kenneth's testimony went "to the heart of the case." We conclude that counsel's actions were not up to standard, but we must next decide whether counsel's performance prejudiced Huff. Huff argues that he was prejudiced because counsel's deficiency denied him the opportunity to use the testimony as substantive evidence to develop a theory that attacked the "knowingly" element of felonious assault, and because he could not impeach Kenneth. (Counsel did impeach Terence with his bindover testimony that Terence did not believe that Huff intended "to hit anybody for real.")

First, we conclude that the bindover testimony would have been inadmissible for impeachment purposes. While the record does not contain Kenneth's testimony from the bindover proceeding, Huff's counsel indicated that Kenneth had testified that he did not believe that Huff intended to harm anyone in the group.

Assuming this was Kenneth's testimony, we cannot say the testimony contradicted Kenneth's trial testimony. Kenneth merely testified at trial as to how Huff handled the gun, angling it down toward Kenneth's legs. That testimony did not contradict any testimony concerning Kenneth's belief about what Huff intended.

■ Second, Kenneth's belief about whether Huff intended to harm anyone would not have refuted the *mens rea* of "knowingly" required for a conviction of felonious assault. "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist." [10] "Knowingly" does not require the offender to have the specific intent to cause a certain result. That is the definition of "purposely." Instead, whether a person acts knowingly can only be determined, absent a defendant's admission, from all the surrounding facts and circumstances, including the doing of the act itself.[11] "Because the intent of an accused person is only in his mind and is not ascertainable by another, it cannot be proven by direct testimony of another person but must be determined from the surrounding facts and circumstances." [12] Thus, Kenneth's testimony that he believed Huff did not "intend" to hit anyone would not have negated, legally, Huff's culpable mental state. We conclude that Huff was not prejudiced by this instance of counsel's deficient performance.

■ Huff also claims that he was denied effective assistance by counsel's failure to object to the testimony of Detective Cox regarding how the ballistics department determined whether a certain gun fired a particular bullet. The state showed Detective Cox a laboratory report. Before trial, the parties had stipulated that the state would not need to bring in the author of the report to testify that the .25 caliber casings matched the .25 caliber gun. (The gun was found after the shooting in an apartment where Huff and others were also found. The casings were found at the site of the shooting.) The trial court told the jury that the parties had stipulated "that this is the gun that was found and the casings which were found," and that no one from the ballistics department would need to testify. Neither party wanted to add anything to the stipulation.

The state asked Detective Cox how a ballistics expert determined what gun had fired what bullets. The detective stated that he was not an expert and then proceeded to explain how the determination was made. There was no foundation

---

**10.** R.C. 2901.22(B).

**11.** See *State v. Adams* (June 8, 1995), Ross App. No. 94CA2041, unreported., 1995 WL 360247

**12.** See *State v. Adams, supra; State v. Paidousis* (May 1, 2001), Franklin App. No. 00AP–1118, unreported, 2001 WL 436079.

laid as to his experience with ballistics. Further, his testimony did not qualify as a lay opinion under Evid.R. 701. Although perhaps the testimony should have been objected to, we conclude that its admission was not prejudicial. The stipulated laboratory report established that the .25–caliber pistol found at the apartment fired the cartridge cases found at the shooting scene.

Further, Huff claims that he was denied effective assistance of counsel because his trial counsel failed to move to suppress evidence related to his identification as the shooter or to object during trial to the admission of such evidence. It is not *per se* ineffective assistance to fail to move to suppress evidence.[13] Even if such a motion should have been filed and the complained-of evidence excluded, Huff must still demonstrate that he was prejudiced.[14]

In determining the admissibility of an identification, a court must determine whether the identification procedure was impermissibly suggestive and, if so, whether, under the totality of the circumstances, the identification was reliable in that there was not " 'a very substantial likelihood of irreparable misidentification.' " [15] Even if we assume, for the sake of argument, that the one-photograph procedure was unduly suggestive,[16] we conclude that the identification of Huff was reliable.

Huff had been identified by name as someone the victims knew before they had been shown the photograph. Thus, the victims identified Huff on a basis independent from the photograph. The photograph was not used to identify an unknown attacker, but was used merely to confirm Huff's true identity.

A strong showing of reliability can arise from the fact that a victim knew the perpetrator of a crime before the crime was committed.[17] Several of the victims testified that they had seen or knew Huff from the neighborhood before

---

**13.** See *State v. Madrigal* at 389, 721 N.E.2d at 64.

**14.** See *id.*

**15.** See *Manson v. Brathwaite* (1977), 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140, quoting *Simmons v. United States* (1968), 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247.

**16.** See *State v. Padgett* (June 30, 2000), Greene App. No. 99 CA 87, unreported, 2000 WL 873218, and cases cited therein.

**17.** See *State v. Parker* (1990), 53 Ohio St.3d 82, 558 N.E.2d 1164; *State v. Lewis* (Feb. 6, 1985), Hamilton App. No. C–840338, unreported, 1985 WL 9314; *State v. Barnett* (1990), 67 Ohio App.3d 760, 588 N.E.2d 887; *State v. Mitchell* (Dec. 15, 2000), Ottawa App. No. OT–00–012, unreported, 2000 WL 1838928; *State v. Johnjulio* (Sept. 28, 2000), Mahoning App. No. 99 C.A. 65, unreported, 2000 WL 1486763.

the shooting, and that they had witnessed him fighting before the shooting. We see no constitutional problem.

Thus, we conclude that Huff has failed to support this claim that counsel was ineffective for failing to move to suppress his identification based on the single-photograph identification procedure.

Because we conclude, however, that Huff has otherwise demonstrated that he was denied effective assistance of counsel, we sustain his first assignment.

### III. "Tattoo Evidence"

In his second assignment, Huff challenges the trial court's decision requiring Huff to display his tattoos to the jury and allowing Huff to be questioned as to their significance. Huff claims that the state implied that the tattoos signified gang membership.

During its cross-examination, the state had Huff display his tattoos to the jury and asked him what the tattoos meant and why he wore the tattoos. On redirect, Huff's counsel asked him whether he was a gang member. Huff replied that he was not. On recross-examination, the state asked Huff whether his tattoo of a martini glass was a gang symbol, to which Huff replied, "Not that I know of." In its closing argument, the state responded to Huff's counsel's argument that the state had not tied the tattoos to gang activity by arguing, "And you get a tattoo with a crown and six over it, and your only explanation is that I just wanted to get it? That's not a Bugs Bunny or a MOM or a NAVY. That's for your interpretation." Huff claims not only that there was no evidence that Huff's tattoos were gang-related, but that the state's line of questioning was irrelevant and unduly prejudicial and involved the improper use of character evidence. We agree.

As explained by the Virginia Court of Appeals, "Although gang membership alone is not evidence of a defendant's prior bad conduct, a juror might associate a defendant with such an affiliation as a person of bad character or someone prone to aggressive or violent behavior. Therefore, we analyze the admissibility of such evidence under the prior bad act standard. Evidence of prior bad conduct is not admissible to prove that the defendant is a person of bad character and more likely to commit the offense charged; however, it is admissible in certain situations. As with all evidence deemed relevant, before it can be admitted, the trial judge must balance its relevance against the resultant prejudice." [18] The court further commented that courts that have excluded gang evidence have done so because the evidence was not probative, because it related

---

**18.** See *Utz v. Virginia* (1998), 28 Va.App. 411, 420, 505 S.E.2d 380, 384.

to a relatively minor point, or because the point being made could have been made with less prejudicial evidence.[19]

As we have explained, relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[20] Evidence that is not relevant is inadmissible.[21] As the state conceded in oral argument, the tattoo evidence was not relevant. A trial court has broad discretion in deciding whether evidence is relevant and admissible.[22] In this case, the trial court's conclusion that the tattoos were relevant constituted an abuse of discretion. An abuse of discretion occurs if the trial court's decision is "unreasonable, arbitrary, or unconscionable."[23] An unreasonable decision is one in which " 'no sound reasoning process * * * would support' [the] trial court's decision."[24]

The decision to admit Huff's tattoos was an unreasonable decision. References to gang affiliation in relation to Huff's tattoos were also improper. "This evidence bore no relevance to the case and could be viewed as inflammatory and an attack on the character of [Huff]."[25] This was not a case where a witness stated that the assailant had a particular tattoo—this was a blatant attempt to prejudice the jury against Huff. The state's theory was that Huff fired a gun at the group of victims in retaliation for a prior incident with Antwane. Further, there was no explanation linking the tattoos to gangs, even if gang activity were somehow relevant to this case. "Evidence without a basis in fact is irrelevant."[26] Last, there was no proper purpose for inferring any gang activity under Evid.R. 404.[27]

---

19. See *id.* at 421–422, 505 S.E.2d at 385, quoting Annotation, Admissibility of Evidence of Accused's Membership in a Gang (1985), 39 A.L.R.4th 775.

20. See *State v. Zamorski* (2000), 141 Ohio App.3d 521, 752 N.E.2d 288, quoting Evid.R. 401.

21. See Evid.R. 402.

22. See *State v. Zamorski, supra.*

23. See *id.*

24. See *State v. Echols* (1998), 128 Ohio App.3d 677, 700, 716 N.E.2d 728, 744, quoting *AAAA Ent., Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597, 601.

25. See *State v. Weisheit* (Apr. 22, 1993), Cuyahoga App. No. 61821, unreported, 1993 WL 127062.

26. See *State v. Zamorski, supra.*

27. Accord *United States v. Irvin* (C.A.7, 1996), 87 F.3d 860, 865, fn. 6.

■ We must next decide whether Huff suffered material prejudice. "Where a particular record contains other overwhelming evidence of a defendant's guilt, we have previously held that an error in the admission of evidence is not prejudicial." [28] In this case, in light of counsel's ineffectiveness concerning witnesses' credibility, we cannot conclude that Huff was not prejudiced by the jury being allowed to infer that Huff was a gang member based on his having tattoos. Thus, we sustain Huff's second assignment.

Because of our disposition of Huff's first and second assignments, we need not address the alleged sentencing error. Accordingly, we reverse the judgment of the trial court and remand this case for further proceedings consistent with law and this decision.

*Judgment reversed*
*and cause remanded.*

DOAN, P.J., and HILDEBRANDT, J., concur.

---

**28.** See *State v. Zamorski, supra.*