[Cite as *In re D.C.*, 2019-Ohio-4860.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

IN RE: D.C.  :  APPEAL NO. C-180354
  TRIAL NO.   16-6194

  :

  :  *O P I N I O N.*

Appeal From:  Hamilton County Juvenile Court

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  November 27, 2019

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Alex Scott Havlin,* Assistant Prosecuting Attorney, for Appellee State of Ohio,

*Stagnaro Hannigan Koop, Co., LPA,* and *Michaela M. Stagnaro*, for Appellant D.C.

**CROUSE, Judge.**

{¶1} Appellant D.C. was 13 years old at the time he shot another teenager in the stomach, causing serious injuries that required a prolonged hospital stay. D.C. was adjudicated delinquent for committing an act that, had he been an adult, would have constituted felonious assault with an accompanying firearm specification under R.C. 2903.11 and 2941.145. He has appealed, raising three assignments of error: (1) the juvenile court erred by overruling his motion to suppress the eyewitness identification; (2) his adjudication was not supported by sufficient evidence and was against the manifest weight of the evidence; and (3) the juvenile court erred in its disposition of D.C. For the following reasons, the assignments of error are overruled, and the judgment of the juvenile court is affirmed.

### *Factual Background*

{¶2} Two brothers, B.B. and H.B., were walking down the street when they came across a group of teenagers, including D.C. Words were exchanged, and then D.C. shot B.B. in the stomach. B.B. and H.B. both testified and identified D.C. as the shooter.

{¶3} D.C.'s defense was that he was present for the confrontation, but was not the shooter. His only witness was A.S. A.S. testified that he and D.C. were standing with the group during the confrontation with B.B. and H.B., but that he and D.C. were not participating, and were looking at A.S.'s phone when they heard the gunshot. A.S. testified that D.C. was not the shooter.

{¶4} However, A.S.'s testimony conflicted with statements D.C. made to Specialist Longworth shortly after the shooting. Longworth testified that D.C. told

him that during the argument, he witnessed B.B. go into a nearby house and come back out with a gun wrapped in a blanket. At that point, D.C. ran, and only heard the gunshot as he was running away.

{¶5} The magistrate adjudicated D.C. delinquent and the juvenile court adopted the magistrate's decision as its own in its judgment entry. For the sake of clarity, we discuss D.C.'s assignments of error out of order. In his second assignment of error, D.C. claims that his adjudication was not supported by sufficient evidence and was against the manifest weight of the evidence.

### Sufficiency of the Evidence

{¶6} The standard of review when determining whether a juvenile court's adjudication of delinquency is supported by sufficient evidence is the same as the standard used in an adult criminal case. *See In re M.M.,* 1st Dist. Hamilton Nos. C-140628, C-140629, C-140630, and C-140631, 2015-Ohio-3485, ¶ 22, citing *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E. 2d 492 (1991), paragraph two of the syllabus. We must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus.

{¶7} To convict D.C. of felonious assault, the state was required to prove that D.C. knowingly caused or attempted to cause serious physical harm to B.B., or caused or attempted to cause physical harm to B.B. by means of a deadly weapon or dangerous ordnance. *See* R.C. 2903.11(A). To convict D.C. of the firearm specification, the state was required to prove that D.C. had a firearm on or about his person or under his control while committing the felonious assault, and displayed,

brandished, or indicated that he possessed the firearm, or used it to facilitate the offense. *See* R.C. 2941.145(A).

{¶8} B.B. testified that he and H.B. were walking down the street listening to music when D.C. and a group of at least five other people walked past and said something to them. He did not hear what was said, but the two groups stopped roughly 15 feet apart. As B.B. turned around to face D.C. and his group, he saw D.C. pull a gun out of his pants, point it at B.B., and pull the trigger. B.B. testified that he looked at D.C.'s face for five to ten seconds as D.C. was pointing the gun at him. After B.B. was shot, he fell to the ground. H.B. picked him up and carried him to a friend's house, where 911 was called. B.B. identified D.C. as the shooter both pretrial and in court.

{¶9} H.B. testified that as he and B.B. walked past D.C. and his group, somebody said, "Stop F'n playin', I got the gun on me." The two groups started arguing, exchanging words back and forth. Multiple teens in D.C.'s group passed the gun back and forth. H.B. testified that as he and B.B. started walking away, a girl in the group said, "Just shoot him." D.C. got the gun, cocked it back, and shot once, hitting B.B. H.B. identified D.C. as the shooter both pretrial and in court.

{¶10} When viewed in the light most favorable to the prosecution, the evidence presented was sufficient for the juvenile court to find all of the essential elements of felonious assault and the firearm specification proven beyond a reasonable doubt.

## Manifest Weight of the Evidence

{¶11} The standard of review when determining whether a juvenile court's adjudication of delinquency was against the manifest weight of the evidence is the

same as that in an adult criminal case. *See In re Walker*, 1st Dist. Hamilton No. C-040568, 2005-Ohio-2452, ¶ 11, citing *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). This court must

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the adjudication must be reversed and a new trial ordered.

*Walker* at ¶ 11.

{¶12} A.S. was steadfast in his assertion that D.C. did not shoot B.B., but his testimony was confusing and contradictory, and did not match statements D.C. made to Longworth shortly after the shooting.

{¶13} There were some discrepancies between B.B.'s and H.B.'s testimony, but nothing so substantial as to indicate that the magistrate clearly lost his way in resolving conflicts in the evidence presented and weighing the credibility of the witnesses. D.C.'s adjudication was not against the manifest weight of the evidence. His second assignment of error is overruled.

### Motion to Suppress

{¶14} In his first assignment of error, D.C. argues that the juvenile court erred in overruling his motion to suppress B.B.'s pretrial identification of D.C.

{¶15} We review a trial court's ruling on a motion to suppress under a mixed question of law and fact. *State v. Williams*, 2011-Ohio-6032, 968 N.E.2d 1038, ¶ 5 (1st Dist.). We accept the court's findings of fact if they are supported by competent, credible evidence, but we review the application of the law to those facts de novo. *Id.*

{¶16} "Convictions based on eyewitness identification at trial, following a pre-trial identification by photograph, will be set aside only if the photographic identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *State v. Perryman,* 49 Ohio St.2d 14, 358 N.E.2d 1040 (1976), paragraph two of the syllabus, *vacated on other grounds*, 438 U.S. 911, 98 S.Ct. 3136, 57 L.Ed.2d 1156 (1978).

{¶17} When reviewing an eyewitness identification, courts employ a two-part test. *State v. Neal*, 1st Dist. Hamilton No. C-140667, 2015-Ohio-4705, ¶ 28, citing *Perry v. New Hampshire,* 565 U.S. 228, 132 S.Ct. 716, 724, 181 L.Ed.2d 694 (2012). First, the court must determine whether the identification procedure employed by law enforcement was "both suggestive and unnecessary." *Id.* This step does not concern the reliability of the identification; rather it "turns on the presence of state action and aims to deter the police from rigging the identification process." *Id.* at ¶ 30. Only if the court finds the procedure to be unduly suggestive and unnecessary does it move to the second step. *Id.* at ¶ 29.

{¶18} In the second step, the court inquires whether,

under the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive. *Id.* The court should focus on a number of factors in evaluating the witness's ability to make an accurate identification, including (1) the witness's opportunity to view the defendant during the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the suspect, (4) the witness's certainty, and (5) the time elapsed between the crime and the identification.

*Id.* at ¶ 28.

{**¶19**}  In *Neal,* the witness failed to identify Neal in a photo lineup two days after the shooting.  *Id.* at ¶ 38.  A month later, after Neal had been arrested, the witness went to police and identified Neal as the shooter.  She explained that she had been in an intimate relationship with Neal, whom she knew as "Chucky."  *Id.*  The police then showed her a single photograph of Neal to confirm that they were talking about the same person—that the person she knew as Chucky was indeed Neal.  *Id.* This court stated that "while the use of a one-photo procedure was arguably suggestive," the identification was reliable under the totality of the circumstances. *Id.* at ¶ 41.  When police showed the witness Neal's photo, she had already told them that she had known Neal for several months and had been in an intimate relationship with him.  *Id.*  The officer showed her Neal's photo not to identify an unknown person, but to verify that the person she knew as Chucky was in fact Neal. *Id.*

{**¶20**}  In *State v. Huff,* 145 Ohio App.3d 555, 558-559, 763 N.E.2d 695 (1st Dist.2001), a group of boys got into a fight with Huff, and then later that same day, Huff returned with a gun and shot at the group.  The boys told police that "Cleavon" did the shooting, but they were not sure what his last name was.  *Id.* at 559.  When someone said Cleavon's last name might be Huff, a detective retrieved a single mug shot of Huff and showed it to each of the boys.  *Id.*  They all confirmed that the man in the photo was Cleavon, and that he was the one who shot at them.  *Id.*

{**¶21**}  This court held that even if the one-photo procedure used by the detective was suggestive, the identification was reliable.  *Id.* at 564.  The witnesses identified Huff by name as someone they knew before being shown the photograph,

so there was an independent basis for their identification separate from the photo. *Id.* The photo was used to confirm Huff's identity, not to identify an unknown person. *Id.*

{¶22} In *State v. Levingston*, 1st Dist. Hamilton No. C-090235, 2011-Ohio-1665, ¶ 9, this court held that although a one-photograph procedure is generally suggestive, the identification in that case was nonetheless reliable because the witness knew the defendant before the shooting and identified him as the shooter by name before being shown the photograph.

{¶23} In *State v. Kaiser*, 56 Ohio St.2d 29, 31, 381 N.E.2d 633 (1978), prior to identifying the defendant in a one-photo procedure at the police station, the witness had identified the defendant from a picture in the newspaper. "When a witness has already identified a suspect in circumstances which are not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification, a subsequent identification procedure which may be impermissibly suggestive does not taint the original identification." *Id.* at 32.

{¶24} R.C. 2933.83 lays out protocols for law enforcement to follow when presenting a photo lineup. It is undisputed that a one-photo procedure does not comply with the procedures outlined in R.C. 2933.83. Nevertheless, R.C. 2933.83 does not provide an independent ground for suppression of the identification; rather, compliance or noncompliance with R.C. 2933.83 merely serves as a consideration for courts. R.C. 2933.83(C); *State v. Ruff,* 1st Dist. Hamilton No. C-110250, 2012-Ohio-1910, ¶ 7.

{¶25} In the present case, the magistrate held a suppression hearing on December 13, 2016. Specialist Longworth testified that he briefly talked to B.B. at

the hospital after he was shot, right before he went in for surgery. He asked B.B. who shot him, and understood B.B.'s response as meaning, "I don't know how to tell you who shot me, you know, that he didn't know his name," but that B.B. knew who had shot him.

{¶26} B.B.'s mother testified that the same night as the shooting, while she was at the hospital, H.B. told her that D.C. was the one who shot B.B., and showed her D.C.'s Facebook page. After B.B. got out of surgery and was alert, she showed B.B. photos of D.C. from D.C.'s Facebook page and asked if D.C. was the one who shot him. B.B. said yes. She testified that there were multiple "kids" in each of the photos she showed him, and that B.B. pointed out D.C. as the shooter.

{¶27} Longworth testified that a few days after the shooting, B.B.'s mother contacted him and told him that she had found out who shot B.B. She gave him D.C.'s name, and Longworth pulled up photos from Facebook and from the juvenile court database to confirm that they were talking about the same person. Longworth then met with B.B. and his mother about a week after the shooting. After B.B. told him D.C. was the shooter, Longworth showed B.B. a photo of D.C. B.B. said he was sure that the person in the photo was D.C., and that D.C. was the one who shot him. Longworth testified that "the identification had already been made, and I was just confirming the identification."

{¶28} It is undisputed that the state did not comply with R.C. 2933.83 in using the one-photo procedure, but the initial identification had already been made at the hospital when B.B.'s mother showed B.B. the Facebook photos. Then, B.B. told Longworth that D.C. shot him, and Longworth showed B.B. one photo of D.C. taken from the juvenile court database to confirm that they were talking about the same

person. There was no state action in the initial identification. Although the one-photo procedure utilized by Longworth was arguably suggestive, it was to confirm an identification already made, and so there was an independent basis for the identification separate from the one-photo procedure.

{¶29} There was competent, credible evidence to support the magistrate's decision. Also, pursuant to *Neal, Huff,* and *Levingston,* the magistrate's decision to deny the motion to suppress was not error. The first assignment of error is overruled.

### *The Disposition of D.C.*

{¶30} In his third assignment of error, D.C. claims that the juvenile court erred in its disposition, and presents two issues for review. First, he argues that the mandatory nature of R.C. 2152.17 removes the judge's ability to exercise discretion, thereby violating the Due Process Clauses of the Fourteenth Amendment to the United States Constitution, and Article I, Section 16 of the Ohio Constitution.

{¶31} D.C. was adjudicated delinquent for committing an act that, had he been an adult, would have constituted the crime of felonious assault in violation of R.C. 2903.11, with an accompanying firearm specification in violation of R.C. 2941.145. Therefore, the court was required to commit D.C. to the Department of Youth Services ("DYS") for one to three years for the firearm specification, in addition to the disposition on the felonious assault. *See* R.C. 2152.17(A)(2). D.C. argues that the mandatory nature of this statute violates his substantive due-process rights.

{¶32} Heightened scrutiny only applies in cases implicating a suspect classification or fundamental right. *State v. Ward,* 92 Ohio App.3d 631, 633, 637

N.E.2d 16 (1st Dist.1993). The focus is on D.C.'s conduct that led to his arrest and adjudication, which was his use of a firearm in the commission of a felonious assault. *See id.* This type of conduct is not protected as a fundamental right, so rational basis is the appropriate standard of review. *See id.*

{¶33} A statute subject to rational-basis review will be upheld as long as it is rationally related to a legitimate governmental purpose. *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 34.

{¶34} The state has no obligation to produce any evidence to sustain the rationality of a statutory classification. *State v. McKinney,* 2015-Ohio-4398, 46 N.E.3d 179, ¶ 22 (1st Dist.). Rather, the "party challenging the statute bears the burden to negate *every conceivable basis* that might support the legislation." (Emphasis added.) *Id.*, quoting *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray,* 127 Ohio St.3d 104, 2010-Ohio-4908, 936 N.E.2d 944, ¶ 20.

{¶35} The Due Process Clause is applicable in juvenile proceedings, and although its requirements are inexact, fundamental fairness is the overarching concern. *State v. D.H.,* 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 51. The parens patriae role of the state in promoting the welfare of the child makes a juvenile proceeding fundamentally different from an adult criminal trial. *Id.* at ¶ 50. Because of the state's stake in the rehabilitation of the juvenile offender and the parens patriae role that the state plays in juvenile justice, a balanced approach is necessary to preserve the special nature of the juvenile process while protecting procedural fairness. *Id.* at ¶ 49.

{¶36} In *In re C.P.,* 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729, ¶ 86, the Ohio Supreme Court held that a statute that automatically imposed lifetime

sex-offender registration for juveniles convicted of certain sex offenses *without the participation of a juvenile judge*, violated due process. (Emphasis added.) The court stated that the "disposition of a child is so different from the sentencing of an adult that fundamental fairness to the child demands the unique expertise of a juvenile judge." *Id.* at ¶ 76.

> R.C. 2152.86 eliminates the discretion of the juvenile judge, this essential element of the juvenile process, at the most consequential part of the dispositional process. R.C. 2152.86 requires the automatic imposition of a lifetime punishment—with no chance of reconsideration for 25 years— without benefit of a juvenile judge weighing its appropriateness. An automatic longterm punishment is contrary to the juvenile system's core emphasis on individual, corrective treatment and rehabilitation.

*Id.* at ¶ 77.

{¶37} However, the special discretion of the juvenile court judge sometimes yields to the directives of the legislature. In finding that certain mandatory bindover provisions did not violate substantive due process, this court explained that the legislature could have "rationally determined that crimes involving firearms committed by older juveniles were sufficiently serious that society would not be adequately protected by the more lenient juvenile court system." *State v. McKinney,* 2015-Ohio-4398, 46 N.E.3d 179, ¶ 23 (1st Dist.).

{¶38} Also, commitment to DYS is substantially different from a prison sentence. Commitment to DYS directly advances the state's interest as parens patriae. *In re J.T.,* 2017-Ohio-7723, 85 N.E.3d 763, ¶ 33 (8th Dist.). A commitment to DYS allows the state to protect a child from negative outside influences and allows

the child to obtain treatment, support, and education. *Id.* In *J.T.*, the defendant argued that R.C. 2152.17(A) violates the equal protection clause because it imposes a firearm specification in instances where the adult statutory counterpart (the crime of having a weapon while under disability) does not. *Id.* at ¶ 27. The Eighth District found that although the statute does impose firearm specifications in situations in which it would not be imposed upon adults, R.C. 2152.17(A) is rationally related to the legitimate governmental purposes of rehabilitating the child and protecting the public. *Id.* at ¶ 34.

{¶39} It is clear that the discretion of the juvenile judge is key to fulfilling the purposes of juvenile court. However, R.C. 2152.17 is substantially different from the statute at issue in *C.P.* The statute in *C.P.* imposed a lifetime, adult penalty without any input from the juvenile judge. R.C. 2152.17(A)(2) imposes a mandatory commitment of one to three years, which is far from being a lifetime punishment, is not an adult penalty, and does involve, although limited, some discretion on the part of the juvenile judge.

{¶40} D.C. has failed to show that the mandatory nature of R.C. 2152.17(A)(2) is not rationally related to any legitimate governmental purpose. To further the state's role as parens patriae and to protect the public, the legislature could have rationally determined that juveniles who use firearms in the commission of a felony offense be mandatorily committed to DYS for at least one year in addition to the penalty for the underlying offense.

{¶41} In his second issue for review under his third assignment of error, D.C. argues that the juvenile court erred in imposing a mandatory, maximum commitment without considering the purposes of juvenile dispositions.

{¶42} We review a juvenile court's disposition for an abuse of discretion. *In re D.S.,* 111 Ohio St.3d 361, 2006-Ohio-5851, 856 N.E.2d 921, ¶ 6. Therefore, the decision will not be reversed unless it is arbitrary, unconscionable, or unreasonable. *Carnes v. Carnes*, 2015-Ohio-2925, 38 N.E.3d 1214, ¶ 10 (1st Dist.).

{¶43} A juvenile court has broad discretion to craft an appropriate disposition for a child adjudicated delinquent, but its disposition must be reasonably calculated to serve the statutory purposes of juvenile dispositions. *In re D.S.* at ¶ 6.

> The overriding purposes for [juvenile dispositions] are to provide for the care, protection, and mental and physical development of children subject to this chapter, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender.

R.C. 2152.01(A).

{¶44} D.C. points to no evidence to support his contention that the juvenile court did not consider the purposes of juvenile dispositions in committing him to DYS. Contrary to his assertions, the juvenile court did consider his request to be sent to a community rehabilitation facility in lieu of DYS, but declined to do so because "based on the level of violence that occurred and based on the level of violence that occurred prior to this, this is not a case, at least not initially that I believe is appropriate for [community rehabilitation]."

{¶45} The court also recounted D.C.'s lengthy record for a 13-year-old—35 charges and 12 adjudications, including multiple felonies. The court emphasized D.C.'s use of a gun in the commission of the offense—"I view such level of violence as the most grave situation that we face for the impact that it has." The court also

recounted the efforts taken previously by the court to avoid commitment to DYS, all of which failed. These efforts included case management, probation supervision, electronic monitoring, community service, work detail, day treatment, partial hospitalization, residential placement, outpatient counseling, and random drug screens.

{¶46} Where all reasonable, less drastic efforts failed, the juvenile court exercised its broad discretion in committing D.C. to DYS. The court's adjudication was reasonably calculated to serve the purposes of R.C. 2152.01(A), and the court did not abuse its discretion in its adjudication of D.C. D.C.'s third assignment of error is overruled.

### *Conclusion*

{¶47} For the foregoing reasons, D.C.'s assignments of error are overruled, and the judgment of the juvenile court is affirmed.

Judgment affirmed.

MOCK, P.J., and MYERS, J., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.