[Cite as *In re K.G.*, 2026-Ohio-1938.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| IN RE: K.G. | : | APPEAL NO.   C-250534<br>TRIAL NO.    25/313-01 Z |
| | : | |
| | : | JUDGMENT ENTRY |

This cause was heard upon the appeal, the record, the briefs, and arguments.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 5/27/2026 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *In re K.G.*, 2026-Ohio-1938.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


IN RE: K.G.                          :          APPEAL NO.   C-250534
                                                TRIAL NO.    25/313-01 Z
                                     :

                                     :

                                                O P I N I O N
                                     :


Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 27, 2026


*Connie Pillich,* Hamilton County Prosecuting Attorney, and *Norbert Wessels,* Assistant Prosecuting Attorney, for Plaintiff-Appellee*,*

*Raymond T. Faller*, Hamilton County Public Defender, and *Margaret Kane*, Assistant Public Defender, for Appellant K.G.

BOCK, **Judge.**

**{¶1}** Appellant K.G. appeals the juvenile court's judgment, which adjudicated him delinquent for an act that, if committed by an adult, would have constituted second-degree felonious assault, along with firearm specifications, and imposed a term of commitment to the Department of Youth Services ("DYS"). Because we hold that K.G.'s adjudication was not against the manifest weight of the evidence and that the juvenile court did not abuse its discretion in ordering a term of commitment to DYS, we affirm.

## I. Factual and Procedural History

**{¶2}** The State charged K.G. with felonious assault in violation of R.C. 2903.11(A)(2) and two firearm specifications—possession and facilitation—for firing four gunshots toward the victim. At trial, after K.G. stipulated that he was 16 years old at the time of the offense, the State presented the victim's and a police officer's testimony.

### A. The victim and her description of the events

**{¶3}** The victim testified that she and her former girlfriend, D.H., began arguing through text messages and then continued the argument over a FaceTime call. During the FaceTime call, the victim saw three people in a car: D.H. was in the front passenger seat, D.H.'s friend J. was driving the car, and a male, later identified as K.G., was seated in the backseat. The victim's ongoing argument with D.H. led her to believe that they were driving to her apartment to fight.

**{¶4}** The victim said that D.H., J., and K.G. arrived in a car at her apartment complex around 5:35 p.m., when it was "still light outside." When the three arrived, the victim was sitting in her friend's car in the parking lot next to her apartment building ("the north lot"). She testified that J. pulled the car into the north lot, left the

north lot, and then entered a parking lot across from her apartment ("the south lot").

{¶5} Once parked, J. and K.G. exited the car. The victim testified that she was standing near the end of the north lot's driveway, close to a sidewalk, when she saw J. hand a gun to K.G. The victim testified that K.G. pointed the gun at her and fired four shots. She estimated that K.G. was about 12 feet away when he fired the gun. She dove to the ground when the gunfire started and scrambled to her car. The victim testified that J. and K.G. got back into J.'s car and drove off.

{¶6} The victim's mother, D.F., testified that she was at home in the apartment she shared with the victim when she heard four gunshots roughly between 6:15 and 6:30 p.m. She looked out the window and saw her daughter, the victim, pulling herself up by the door handle of her car. After determining that her daughter had not been hit, D.F. called 9-1-1.

{¶7} The victim, after confirming her friend was unharmed, left in her own car to look for J.'s car, but she returned to her apartment complex when she could not find them. When she arrived home, police officers were on the scene.

{¶8} A police officer at the scene directed the victim to D.H.'s Instagram page. (The victim had already been using her phone to look up the correct spelling of D.H.'s name.) From D.H.'s page she located a photograph of J. and then explored J.'s Instagram posts. There, she found several photographs of K.G. and identified him as the shooter. The victim testified she did not know K.G. before that day.

{¶9} On cross-examination, the victim testified that when the car "first pulled in, I was on the phone with [D.H.]. And I [saw] that the young man was in the back seat, which is [K.G.]. And I saw [J.] driving." The magistrate then asked, "Because you were on FaceTime?" and the victim replied, "Correct." The victim explained that she ended the FaceTime call when J. and K.G. exited the car.

{¶10}   When cross-examining the victim, K.G.'s counsel played officers' body-worn-camera ("BWC") video to prove she had pinpointed for police officers her exact location, which was significantly further away from where the shooter stood than what she had said at trial. But the victim explained the video showed her walking away from police so she could point to where she had been standing. Defense counsel extensively questioned her about if and when the video showed her exact location at the time of the shooting. Ultimately, the magistrate found that none of the BWC video submitted by K.G. showed exactly where the victim had been standing when she saw K.G. point the gun at her, and therefore, the magistrate indicated that she would not consider any of the statements made on the BWC video.

### B. Police officers testified about their investigation

{¶11}   Four police officers testified at trial. Officer Richmond testified that he arrived at the apartment complex ten minutes after a witness called 9-1-1. He explained that it was getting dark, "but [was] still light" outside. Richmond found four 9 mm casings near a dumpster in the south lot, down a small slope. He testified that a 9 mm handgun ejects a casing about two to five feet and that all four casings were of the same caliber. He did not look for any property damage or bullet fragments.

{¶12}   Officer Croswell testified that he searched the scene for damage caused by the gunfire, but he found no bullet holes in any of the cars parked nearby. While he was initially surprised by the lack of damage, he explained that there is not always property damage when shots are fired. Officer Wills also testified that he did not find any property damage to the apartment building or cars from gunfire.

{¶13}   Finally, Officer West testified that he arrived on the scene at 6:41 p.m. He agreed that his BWC footage showed the scene as it was when he arrived and that it was getting dark outside. He explained that there was a "little bit of a hill" in front of

where the casings were found and estimated that the distance between the entrance of the north lot to the entrance of the south lot was 50 feet. Officer West also testified that in his experience and based on the scene, the shooter could have fired the gun upwards and the shooter also could have fired the gun toward a person.

### C. Magistrate's Adjudication, K.G.'s Objections, and Judgment

**{¶14}** The magistrate adjudicated K.G. delinquent, finding the victim's testimony credible. The magistrate emphasized that the victim saw K.G. exit J.'s car, point a gun at her, and fire four shots. Further, the magistrate pointed out that the victim had seen K.G. on a FaceTime call just before the shooting.

**{¶15}** K.G. filed objections, arguing that the magistrate's credibility finding was unsupported. He claimed that BWC footage contradicted the victim's account regarding the time of the shooting, how light it was outside, and her location. He further asserted that the victim had a motive to fabricate the allegation because she was upset with D.H. because D.H. had rejected the victim's romantic advance.

**{¶16}** Further, K.G. objected to the finding that K.G. was the shooter. He asserted that the victim could not have identified him because of the dusk lighting, distance between her and the shooter, the brevity of the FaceTime call, and the victim's reliance on Instagram photos. K.G. argued that the State failed to establish intent or motive for felonious assault, emphasizing the lack of any relationship between K.G. and the victim and the absence of physical evidence at the scene.

**{¶17}** After a hearing, the juvenile court overruled K.G.'s objections, adopted the magistrate's decision, and set a disposition-hearing date. Before the disposition hearing, K.G. moved under Juv.R. 29(F)(2)(d) to dismiss the firearm specifications, which the court denied.

**{¶18}** At the disposition hearing, K.G. presented letters from community

members, family, and juvenile-detention-facility service providers. The letters described K.G. in a positive manner, such as emphasizing his respectfulness, good grades, attitude, and behavior. K.G.'s counsel emphasized that this was K.G.'s first contact with the juvenile court system.

**{¶19}** At the end of the hearing, the juvenile court adjudicated K.G. delinquent and committed K.G. to DYS on the felonious-assault charge for a minimum term of 12 months and a maximum term not to exceed his 21st birthday. The court imposed an additional two-year term for the facilitation specification.

**{¶20}** K.G. now appeals, raising three assignments of error.

## II.  Analysis

### A.  Adjudication is not against the weight of the evidence

**{¶21}** In his first assignment of error, K.G. contends that his felonious-assault delinquency adjudication was against the manifest weight of the evidence.

**{¶22}** When determining whether a juvenile court's delinquency adjudication is against the manifest weight of the evidence, we employ the same standard of review used in an adult criminal case. *In re D.C.*, 2019-Ohio-4860, ¶ 11. "This court must 'review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the adjudication must be reversed and a new trial ordered.'" *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983). We afford substantial deference to a factfinder's credibility determinations, as the factfinder sees and hears the witnesses. *State v. Escobar*, 2021-Ohio-4001, ¶ 44 (1st Dist.), citing *Barberton v. Jenney*, 2010-Ohio-2420, ¶ 20.

*1. The victim's testimony was not inconsistent*

**{¶23}** K.G. first argues that the court's finding that the victim was credible was not supported by the record because the victim's testimony was inconsistent with other evidence presented at trial. For example, K.G. points to the victim's testimony about the time of the incident. While the victim testified that the shooting occurred around 5:35 p.m., her mother testified she heard gunshots between 6:15 and 6:30 p.m. But this discrepancy is minor and does not render the victim's account unbelievable. The victim also said it was light outside at the time of the shooting, which was consistent with her mother's testimony that it was light but getting darker and with Officer Richmond's testimony that it was "getting dark" but still light when he arrived shortly after 6:30 p.m.

**{¶24}** K.G. also contends the victim's testimony as to her location at the time of the shooting was inconsistent with the BWC footage, which K.G. argues shows the victim was standing significantly further away from where the shooter was standing. He also points to the victim's mother's testimony that she saw the victim near her car after the shooting. But the victim testified that she ducked down and went to her car when K.G. began shooting, which explains why she was near her car. Moreover, the magistrate explicitly stated that the BWC footage did not show the victim's precise location when the shooting began. We agree with this finding. It is reasonable to interpret the BWC footage as depicting the victim walking away from the officers and then pointing somewhere off camera to where she had been standing. The video did not contradict her testimony at trial.

**{¶25}** K.G. next challenges the victim's testimony that the shooter stood in the "north-central section of the south parking lot," noting that casings were found further south near a dumpster. Police officer testimony established that 9 mm casings eject

8

only a few feet, but given the south lot contained a slight slope, the trier of fact reasonably could have inferred that the casings travelled down that slope from where K.G. had been standing. Regardless, even if the shooter had stood farther down the lot, that does not contradict the victim's testimony about where she was standing or that she saw K.G. point the gun at her.

{¶26} K.G. also disputes the victim's estimate that the shooter was 12 feet away, pointing to Officer West's testimony that the distance between the parking lots was about 50 feet. The victim's estimate was clearly a guess, and even if inaccurate, she consistently testified that she could see K.G.

{¶27} Next, K.G. asserts that the absence of property damage or bullet fragments contradicts the victim's claim that the shots were aimed at her. Although officers expressed some surprise at the lack of damage, they also testified that gunfire does not always result in property damage.

{¶28} Next, K.G. points out the victim's description of flat terrain between her and K.G. was inconsistent with officer testimony saying there was a hill between them. But the officer testified that only a small slope existed in the south lot, and that testimony is consistent with video evidence.

{¶29} Finally, K.G. argues the victim's testimony that she did not care about D.H. rejecting her advances was inconsistent with evidence of angry text messages from the victim to D.H. But even if the victim was upset, that does not undermine her testimony that she saw K.G. point a gun at her and fire four shots.

{¶30} Based on the foregoing, we cannot say that the victim's testimony was so inconsistent with other evidence presented at trial that the court's credibility determination should be disregarded.

*2. The identification testimony was reliable*

**{¶31}** Next, K.G. maintains that the court should have afforded little weight to the victim identifying him as the shooter. He cites the lighting conditions and their distance from one another.

**{¶32}** When considering the reliability of an identification, relevant factors include the witness's opportunity to view the suspect, degree of attention, the accuracy of prior descriptions, the witness's certainty at the time of identification, and the length of time between the crime and identification. *State v. Cook*, 2020-Ohio-2844, ¶ 24 (8th Dist.).

**{¶33}** Here, the victim indicated that she saw K.G. on the FaceTime call and when he exited from the car with J. Although the time was brief, she was able to view K.G. in the back seat of the car before the shooting, when she was not distracted by the gun. Shortly after the shooting, the victim identified K.G. as the shooter in multiple photographs posted on J.'s Instagram account. When she first identified K.G., the victim was certain that she had done so correctly. Given these circumstances, and deferring to the lower court's credibility determination, we cannot say that the victim's identification testimony was unreliable.

*3. The victim's testimony that K.G. aimed the gun at her was reliable*

**{¶34}** Finally, K.G. contends that the weight of the evidence supports finding that K.G. did not aim the gun at the victim.

**{¶35}** K.G. emphasizes the lack of property damage, the distance between the shooter and the victim, and the fact that K.G. and the victim did not know each other. But the victim testified it was still light out when the shooting began, which was corroborated by her mother and police officers, and she saw K.G. point the gun at her. Further, although police officers found no property damage, an officer testified that

the lack of damage did not indicate whether the gun had been pointed upwards or toward the victim, as both scenarios were plausible.

{¶36} We hold that the juvenile court's credibility determination was supported by the record and the juvenile court did not lose its way or create a manifest miscarriage of justice in adjudicating K.G. delinquent. We overrule K.G.'s first assignment of error.

## B. R.C. 2152.17(A)(2) is constitutional as applied

{¶37} In his second assignment of error, K.G. argues that R.C. 2152.17(A)(2)—which mandates a commitment to DYS for the firearm-facilitation specification—is unconstitutional as applied to him. He contends that the statute violates the Due Process Clause of the Fourteenth Amendment because it prevents the juvenile court from conducting an individualized assessment before imposing disposition, particularly in his case as a juvenile with no prior adjudications.

{¶38} We review constitutional challenges de novo. *In re K.S.G.*, 2020-Ohio-4515, ¶ 37.

{¶39} Under R.C. 2152.17(A)(2), when a juvenile is adjudicated delinquent for committing an act justifying a firearm facilitation specification, the juvenile court must impose a mandatory commitment to DYS for a definite period of not less than one and not more than three years. This period is in addition to the commitment for the underlying offense. R.C. 2152.17(A)(2)'s mandatory provision applies to all juveniles, regardless of whether the juvenile has prior adjudications.

{¶40} K.G. argues that the statute unconstitutionally removes the juvenile court's discretion to fashion a disposition that serves the purposes of the juvenile sentencing scheme: "to provide for the care, protection, and mental and physical development of children . . ., [and] protect the public interest and safety, hold the

offender accountable for the offender's actions, restore the victim, and rehabilitate the offender." *See* R.C. 2152.01(A).

**{¶41}** In 2019, this court rejected a facial constitutional challenge to R.C. 2152.17(A)(2) and upheld the mandatory nature of R.C. 2152.17(A)(2), holding it is rationally related to legitimate governmental purposes, such as protecting the public and furthering the state's role as "parens patriae." *In re D.C.*, 2019-Ohio-4860, ¶ 40 (1st Dist.). We emphasized that the legislature could rationally determine that juveniles who use firearms in the commission of felonies should face mandatory commitments to DYS. *Id.*

**{¶42}** K.G. has not explained how the facts in his case—a 16-year-old with no prior adjudications, who chose to fire a gun four times at a person he did not know with little provocation—makes the mandatory commitment to DYS unconstitutional. *See State v. Campbell*, 2013-Ohio-5612, ¶ 16 (1st Dist.) ("The party contending that a statute is unconstitutional as applied bears the burden to present clear and convincing evidence of a presently existing state of facts that make the statute void when applied to those facts.") The mandatory commitment does not conflict with the purposes of the juvenile sentencing scheme, which includes both rehabilitation and protecting public safety. Moreover, the statute does not strip the juvenile court of all sentencing discretion—the juvenile court retains discretion to determine the length of the commitment to DYS.

**{¶43}** We hold that R.C. 2152.17(A)(2) is constitutional as applied to K.G. and we overrule his second assignment of error.

### C. The juvenile court's disposition was reasonable

**{¶44}** In his third assignment of error, K.G. contends the juvenile court abused its discretion by imposing a two-year commitment to DYS on the facilitation

specification. We review a juvenile court's dispositional order for an abuse of discretion. *In re D.S.*, 2006-Ohio-5851, ¶ 6. A trial court abuses its discretion when its judgment is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A court never has discretion to misapply the law. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38.

**{¶45}** K.G. first argues that the juvenile court committed a legal error by imposing a two-year commitment on the facilitation specification because before imposing the sentence, the court stated, "unfortunately in this case there haven't been any reasonable efforts . . . because it's a mandatory sentence and therefore you'll be committed to the legal custody of [DYS]." The court then imposed 12 months on the underlying offense and two years on the facilitation specification. According to K.G., this suggests the court believed the two-year term was mandatory, particularly because it did not explain why it selected more than the minimum one-year term.

**{¶46}** We are not convinced that the juvenile court misunderstood the law. *See State v. Williams*, 2020-Ohio-5245, ¶ 10 (1st Dist.) (recognizing that in a bench trial, where the record contains no substantiation that the court applied the wrong standard, we may presume regularity of the proceedings); *see also State v. Wright*, 2001-Ohio-2124, ¶ 4 (3d Dist.) ("[W]hen reviewing a bench trial an appellate court may presume the trial court applied the law correctly unless the record clearly indicates otherwise."). At the dispositional hearing, the State explicitly outlined the court's dispositional options and noted that the specification permitted a one-, two-, or three-year term. Although the court did not articulate why it selected a higher-than-minimum term, it was not required to do so, and K.G. did not request clarification. Accordingly, given the discretionary nature involving the length of commitment, the record does not show that the juvenile court misunderstood the law.

**{¶47}** Next, K.G. argues that the juvenile court acted unreasonably in imposing more than the minimum term on the facilitation specification, emphasizing that this was K.G.'s first contact with the juvenile system and that significant mitigation was presented. Letters from service providers at the juvenile detention center and friends described K.G. as respectful, smart, well-behaved, and positive in attitude. K.G.'s aunt and guardian added that K.G. helped with younger children at home and had been on the track team. The State countered that K.G. showed little remorse, that the offense was violent, and that K.G. was fortunate the victim was not struck. The State also noted the victim and her mother remained fearful and traumatized.

**{¶48}** Under R.C. 2152.16(A)(1)(d), a juvenile adjudicated delinquent for conduct that would constitute a second-degree felony if committed by an adult may be committed to DYS for an indefinite term of one year up to age 21. And when the court finds a firearm specification under R.C. 2941.145, R.C. 2152.17(A)(2) requires a definite term of one to three years on the specification, in addition to the commitment for the underlying act.

**{¶49}** The juvenile court acknowledged that this was K.G.'s first system involvement but emphasized that K.G. fired four shots at a stranger with minimal provocation and was fortunate no physical harm resulted. Given this reasoning and the statutory framework, the record does not show that the court acted unreasonably or arbitrarily. We overrule K.G.'s third assignment of error.

### III. Conclusion

**{¶50}** We overrule the assignments of error and affirm the juvenile court's judgment.

Judgment affirmed.

14

**CROUSE, P.J.,** and **NESTOR, J.,** concur.